**UNITED STATES, Appellant,**

v.

**Henry BENNETT, Appellee.**

**No. 85–469.**

District of Columbia Court of Appeals.

Argued June 27, 1985.

Decided Aug. 20, 1986.

Ellen Bass, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Normal Paul Patterson, Asst. U.S. Attys., were on the brief, for appellant.

Christopher Stone, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellee.

Before MACK, BELSON and ROGERS, Associate Judges.

BELSON, Associate Judge:

Following an evidentiary hearing, the motions judge granted appellee Bennett's motion to suppress certain evidence, quantities of marijuana and phencyclidine (PCP). The United States appeals, asserting that the trial court erred in finding the government was unable to point to specific and articulable facts that warranted the police officers' actions that led to the seizure of the controlled substances. We agree, and reverse.

Undercover officers Morin and Young, members of a narcotics task force arrest team, were working in a high narcotics traffic area where PCP was known to be sold. They drove their car (apparently unmarked) into an alley and saw four men. They saw one passing money to another. They saw a third, appellee Bennett, sticking his hand into his waistband. The officers stopped the car near the suspects. Before the officers got out of the car the man who had received the money bolted in one direction and Bennett fled in the opposite direction, his hand still in his waistband, "trying to pull out whatever he had

in there." The officers suspected that they had come upon a narcotics transaction. Officer Young testified that the normal pattern is for one drug seller to hold the money, and another to hold the narcotics. He was aware that sellers had previously used the same pattern and method he observed to sell drugs to undercover officers. Therefore, the officers gave chase.

Officer Young, while chasing Bennett, saw him pull on his pants zipper and finally manage to get an object out of his waistband. It was a bright and shiny object. Bennett ran between some cars and over a fence. Young ran around the end of the fence and observed Bennett apparently trying to hide the object near the base of the fence. The officer then came face-to-face with Bennett, and restrained him after a brief scuffle. A search of Bennett's person disclosed his possession of marijuana. The officers recovered the shiny object hidden near the base of the fence. It consisted of twenty-six tinfoil packets containing greenish brown weed and PCP.[1]

Prior to trial, Bennett moved to suppress the tangible evidence recovered by the police as the product of an illegal search. The court held an evidentiary hearing, at which the sole witness, Officer Young, testified to the facts summarized above. Young made his observations as a member of a narcotics team familiar with the modus operandi of PCP purveyors in the area of the incident. Therefore, we know his observations were those of a person of some expertise, even though the record does not show the extent of his experience. After reviewing the evidence, the court concluded that "under these circumstances the Police did not have any reasonable basis to chase—to initi[ate]: a chase of Mr. Bennett in this case.... [T]here was nothing wrong with the conduct of the defendant in this case particularly that gave the Police reasonable suspicion or any other basis on which to chase defendants." The court further concluded that Bennett's discarding the twenty-six tinfoil packets was the product of illegal police activity. Accordingly, the court ordered the suppression of the twenty-six tinfoil packets containing PCP. The court, though it did not specifically order the suppression of the marijuana found on appellee's person, clearly implied it should be suppressed.

■ On appeal, the government stresses that the motions judge did not conclude that the police officers had effected a stop by driving up to the four men and alighting from their car in order to approach them. Clearly, the officers did not violate the Fourth Amendment by merely approaching individuals in an alley. See Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality opinion); Tyler v. United States, 302 A.2d 748, 749 (D.C.1973). Instead, the government notes, the motions judge focused on the time at which the police officers began their chase, and concluded that as of that time the information possessed by the police, including the flight, did not afford adequate basis for a stop.[2] The government argues that as of the time the officers began to chase the fleeing Bennett, they had a particularized and objective ba-

---

1. The dissent repeatedly refers to the fact that the police officer struck appellee in the head with the butt of a gun in the course of arresting him. The record was not fully developed on this point because it was of limited relevance to the issue of the legality of the *Terry* seizure here. (The trial judge permitted counsel to question concerning the level of detention eventually imposed, but sustained an objection on relevancy grounds to a question concerning how Bennett began to bleed over his left eye.) It is clear, however, that prior to the scuffle in which Bennett sustained his injury, the police officer had seen Bennett attempt to hide a shiny object consisting of a large number of tinfoil packets. By the time the officer arrested Bennett, he had ample probable cause to believe that Bennett was engaged in narcotics transactions.

2. The government has not conceded that the chase, unaccompanied by any oral command to stop or display of weapons, was a stop or seizure. Rather, it has taken the position that it is not necessary to reach that issue in order to decide this case. We agree, and do not address that issue here.

sis for suspecting him of criminal activity. We agree.

■■ The factors that had come to the officers' attention before they gave chase were these:

1. The events took place in a "high narcotics area" where the officers had been specifically detailed to intercept trafficking in PCP.

2. Coming upon four men standing in an alley, the officers saw one of them accepting money from another.

3. They saw a third man, Bennett, stick his hand into his waistband.

4. They knew that drug traffickers often worked in pairs, one holding the money, the other holding the drugs—sometimes in his pants.

5. Before the officers got out of their cars, the man with the money and Bennett bolted.

6. Bennett and the man with the money ran in opposite directions, (a tactic helpful to criminals working in pairs).

7. As Bennett began to run, he kept his hand within his waistband, still trying to remove something.

We are satisfied that the foregoing is an articulation of specific facts that warranted a stop.

■■ Bennett argues that it is not "enough if the specific facts pointed out by the officer consist only of innocent behavior." Appellee overlooks the familiar precept that in evaluating behavior for purposes of assessing whether there existed a basis for a stop or seizure, we must look to the totality of what the police observed. *Smith v. United States*, 295 A.2d 64, 66 &

n. 7 (D.C.1972) ("[c]onsidering the totality of the circumstances," including flight, *Terry* stop justified), *cert. denied*, 411 U.S. 951, 93 S.Ct. 1932, 36 L.Ed.2d 414 (1973). Even if each specific action of appellee was of itself susceptible of an explanation consistent with innocence of drug dealing, the observing police officer may see a combination of facts that make out an articulable suspicion. Here, for example, the fact that there are innocent reasons for gathering in an alley in a high narcotic area, for exchanging money, for placing one's hand in his waistband and even, perhaps, for running at the approach of persons who, though in plain clothes, are acting like police officers, it is the combination of those facts and the others listed above that we must evaluate as a basis for Bennett's stop. *Id.*

■■ We note particularly the significance an officer could reasonably attach to Bennett's action in fleeing while still reaching into his waistband—before the officers even got out of their car. We are satisfied that in observing this occurrence, the officer reasonably could have believed that the fleeing suspect thought or feared that the officer was, indeed, an officer.[3] Against the background of the events that had already unfolded, the officer could reasonably have regarded Bennett's flight as strongly suggesting that Bennett was a party to an illegal narcotics transaction.

In a host of opinions, this court has recognized the "general proposition that flight from authority—implying consciousness of guilt—may be considered among other factors justifying a *Terry*[4] seizure." *United States v. Johnson*, 496 A.2d 592,

3. The dissent expresses doubts that Bennett's flight could be attributed to a desire to evade authority, on the grounds that Bennett "could not have *known* that the pursuing police officers were officers." *See* dissent at pp. 419–420 (emphasis added). This observation, while technically correct, is of limited analytical value. Given that the police officers' actions were consistent with those of police officers, and in light of the factors previously enumerated with respect to what Officer Young observed in the alley, it was reasonable for Officer Young to

think that Bennett thought or feared, even if he did not know, that the officers were in fact officers. We are unaware of, and the dissent does not cite, any cases establishing that consciousness of guilt may reasonably be inferred only where in hindsight it can be ascertained that a suspect knew for certain he or she was fleeing from authority.

4. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

597 (D.C.1985), citing *Stephenson v. United States*, 296 A.2d 606, 609–10 (D.C.1972), *cert. denied*, 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973). *See also, Lawrence v. United States*, 509 A.2d 614, 615–16 (D.C. 1986); *United States v. McCarthy*, 448 A.2d 267, 270 (D.C.1982) (flight of defendant's companion was factor justifying investigative stop of defendant); *Franklin v. United States*, 382 A.2d 20, 22 (D.C.1978) (flight from authority, first on foot, then in car, a factor in determining that there was adequate basis for stop), *cert. denied*, 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979); *Tobias v. United States*, 375 A.2d 491, 494 (D.C.1977) (several exchanges of small objects for money, replacement of one such object in shoulder bag upon warning that police were near, and flight gave adequate basis for stop); *Smith v. United States*, 295 A.2d at 66 (flight following suspicious activities regarding automobiles and their contents afforded adequate basis for stop).

We point out that the facts here are significantly different from those in *Gray v. United States*, 292 A.2d 153 (D.C.1972), where we ruled that the trial court had erred in denying a motion to suppress. In *Gray*, the police officers approached and stopped Gray after seeing money exchanged in the street. Another man ran from the scene, but Gray did not. The police patted Gray down and found a gun. Unlike Gray, Bennett fled and while doing so kept his hand in his waistband. The grounds for stopping Bennett were stronger. In *Tobias, supra*, in affirming a conviction and approving a stop, we distinguished *Gray* on two bases, one of which was that unlike Tobias, Gray had not fled. *Tobias*, 375 A.2d at 494.[5]

The facts addressed at the hearing on the suppression motion were undisputed.

The motions judge's findings of fact are unchallenged. But our analysis of the facts before the motions judge in the light of applicable principles of law leads us to conclude that the judge erred in concluding that there was an insufficient basis for a *Terry* stop, and in granting the motion to suppress. Accordingly, the order appealed from is reversed and the case remanded for further proceedings.

*So ordered.*

MACK, Associate Judge, dissenting:

Without reference to statistics, I believe I can say with some degree of confidence, that the vast majority of motions to suppress evidence are denied by the trial courts. Those which are granted reach this court in a somewhat skewed posture. Thus, it is an irony that a motion to suppress, filed by an accused who (it develops) has something to hide, lays the foundation for decisional law that protects the citizen who has nothing to hide. If an appellate court loses sight of this fact, it runs the risk of abdicating its responsibility, not only to protect citizens against arbitrary police seizures, but also to give guidance to conscientious law enforcement officers who in turn are charged with protecting citizens.

Here a trial judge has granted a motion to suppress evidence, after concluding that there was no conduct on the part of the defendant that gave the police "reasonable suspicion or any other basis on which to chase the defendant." My colleagues in the majority, in reaching a different conclusion, are exhibiting the strained recitation of facts, the selective reading of law, and the hesitancy to come to grips with the issue, which can only be expected when an appellate court seeks to substitute its "analysis of the facts ... in the light of ...

---

**5.** We observe that while *Gray* has not been overruled, part of its analysis has been called into question by subsequent Supreme Court decisions. *Gray* apparently posited as a requirement for a *Terry* stop that "a crime of violence had occurred or was about to occur." *Gray*, 292 A.2d at 156. The Supreme Court has approved stops where no such showing was available. *See Florida v. Royer, supra* (approving stop of drug courier; no suspicion of arms or violence); *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (approving stop of truck transporting illegal aliens; no suspicion of arms or violence).

principles of law" for that of the trial judge. Regrettably, in so doing, the majority places this court's stamp of approval upon an armed chase and forcible seizure of any citizen (even by violent means) based solely upon police observation of conduct that objectively is innocent.

The majority's erroneous reasoning follows from its reluctance to decide the precise issue before us. Thus it adopts the position of the government, using the government's factual premise, that it is unnecessary to decide whether a "chase, unaccompanied by any oral command to stop or display of weapons" was a stop or seizure. This position makes it impossible to analytically isolate the true facts [1] or apply the law necessary to determine whether there was a seizure in fact, whether the seizure was illegal and whether the drugs recovered were the fruit of the unlawful seizure. It is telling that the majority in seeing no need to reach the issue, also sees no need to reach the constitutional aspect of the Supreme Court's seminal decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The *Terry* definition of a Fourth Amendment seizure indisputably encompasses the police activity in this case. A Fourth Amendment "seizure" occurs when there is any "physical force or show of authority" by the police which "in some way restrain[s] the liberty of a citizen." *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16. Once the police cease to rely "solely on voluntary cooperation" from an individual, *id.* at 11, 88 S.Ct. at 1874, Fourth Amendment protections are implicated. Under this definition, it is plain that a police chase is a "seizure" under the Fourth Amendment. A police pursuit is a "show of authority" that by definition does not rely upon "voluntary cooperation." *See People v. Howard*, 50 N.Y.2d 583, 592, 430 N.Y.S.2d 578, 585, 408 N.E.2d 908, 914, *cert. denied*, 449 U.S. 1023, 101 S.Ct. 590, 66 L.Ed.2d 484

(1980); *People v. Terrell*, 77 Mich.App. 676, 679, 259 N.W.2d 187, 189 (1977). Moreover, there are certain types of investigative stops—where the police have sought "to verify their suspicions by means that approach the conditions of arrest"—that are "violative of the Fourth Amendment absent probable cause." *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). An armed chase ending with a blow to the head based upon police observation of an exchange of money in an alley is, I submit, a seizure requiring probable cause to arrest.

Even if we assumed that an armed chase can be initiated on less than probable cause, often overlooked is the fact that even when the government comes forward with sufficient "articulable facts" to support a forcible stop, our inquiry is not at an end; for we must determine "the reasonableness *in all the circumstances* of the *particular* government invasion of a citizen's personal security." *Terry, supra*, 392 U.S. at 19, 88 S.Ct. at 1878 (emphasis added). An officer must not only be presented with "appropriate circumstances," *i.e.*, an articulable suspicion—in order to conduct a forcible stop, he must also conduct the stop in "an appropriate manner." *Id.* at 22, 88 S.Ct at 1880. For "a central element in the analysis of [Fourth Amendment] reasonableness" is "*scope* of the particular intrusion, in light of all the exigencies of the case." *Id.* at 17–18 n. 15, 88 S.Ct. at 1878 n. 15 (emphasis added). We must therefore engage in a balancing process, *id.* at 21, 88 S.Ct. at 1879, to determine not only "whether the officer's action was justified at its inception," but also "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879. " 'The greater the intrusion, the stronger the basis for the

---

1. There is no question that the pursuing policeman pulled his revolver and used the butt of it to subdue Bennett—a fact which the trial judge found relevant to the level of detention. Bennett apparently required hospitalization for a head wound although the trial court restricted testimony on this score.

officers' action must be.... In general, if probable cause is lacking, the intrusion must be no greater than the circumstances require.'" *United States v. Ceballos,* 654 F.2d 177, 181 n. 6 (2d Cir.1981) (citation omitted). *See also United States v. Magda,* 547 F.2d 756, 759 (2d Cir.1976) (same).

When a defendant moves to suppress evidence recovered as a result of the type of police activity that occurred here, the government must demonstrate that the chase was valid from its inception, and "must be able to point to specific and articulable facts, which, taken together with rational inferences from those facts reasonably warrant[ed] th[e] intrusion." *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1880. *See United States v. Jones,* 619 F.2d 494, 498 (5th Cir.1980); *People v. Glover,* 82 A.D.2d 43, 46, 441 N.Y.S.2d 242, 244 (1981) ("the police do not have the right to chase every 'suspicious-looking' individual where there is no indication of criminal activity afoot"); *Commonwealth v. Jeffries,* 454 Pa. 320, 325, 311 A.2d 914, 917 (1973) (action of police in chasing defendant based on no articulable facts and then arresting him after he threw something under a car was a violation of the Fourth Amendment). Until today's decision, we have followed the Supreme Court's lead in requiring a predicate foundation of objective criteria of reasonableness to be satisfied in order to uphold a seizure on less than probable cause, and have refused to be satisfied with an officer's subjective belief in likely

criminality alone. The rationale for these guidelines has always been clear: "When [ ] a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979).

Ignoring the fact that we are faced with a record of an armed chase, the majority strings out some "specific facts" coming to attention of the officers before they gave chase. Reduced to objective observations, we know that the officer who chased Bennett saw only that four men were standing in broad daylight in an alley near Crittenden Street and Georgia Avenue, N.W., and that one man was accepting money from another (neither being Bennett).[2] This officer, when asked a rather leading question about what Bennett was doing physically, answered that his "best recollection" was that Bennett was "sticking his hand down in his waistband." This testimony was embellished by the officer's testimony that the location was one "where it is normally dealing in PCP," "where we wind up hav[ing] to chase a few," and now by this court's comment (*supra* p. 415) that "we know that [the officer's] observations were those of a person of some expertise, even though the record does not show the extent of his experience."

The majority concedes that there are innocent reasons for gathering in an alley in a high narcotic area,[3] for exchanging mon-

**2.** *See, e.g.,* the court's questioning of the witness:
THE COURT: Well, what made you think you had a drug sale?
THE WITNESS: Well, we were near Crittenden and Decatur and Georgia Avenue, where it is normally dealing in PCP. That is where we normally catch them at. We wind up having to chase a few. The normal pattern is you have one person who will hold the money and one person who has the narcotic. And the other two subjects at this point we are talking about were the buyers.
THE COURT: All right. You saw money, and you didn't see any other objects?
THE WITNESS: No, not at that point.
THE COURT: So, you saw four people together. You saw one person giving another person money, and you saw two people running away, and

it was an area where you have made other drug arrests in the past?
THE WITNESS: That is correct. They used the same pattern and the same method that they have sold drugs to undercover officers in the same way.

**3.** Regrettably, it is necessary to remind again that thousands of citizens live and go about their legitimate day-to-day activities in areas which surface, sometimes surprisingly, in court testimony, as being high crime neighborhoods. The fact that the events here at issue took place at or near an allegedly "high narcotics activity" area does not objectively lend any sinister connotation to facts that are innocent on their face. We have repeatedly so held in our decisions. *See Curtis v. United States,* 349 A.2d 469, 472

ey, for placing one's hand in his waistband "and even perhaps, for running at the approach of persons, who, though in plain clothes, are acting like police officers." (*Supra* p. 416). The "facts" from which the majority apparently draws the most solace are that: Bennett and the man with the money ran in opposite directions (characterized as being a tactic of criminals) and that Bennett in running kept his hand within his waistband "still trying to remove something." The problem with accepting the majority's "flight from authority" inference is that there is absolutely nothing in the record to show that Bennett could have known that two undercover officers in an unmarked car, who did not identify themselves, nor order a halt, were "authority." The record does not show that the police officers were acting like police officers. It is difficult to infer consciousness of guilt from the flight of a man who is being pursued by a stranger, a stranger who in the course of a chase, brandishes a revolver ultimately used to pistol whip his prey about the head.

Even if we could assume that Bennett knew the unidentified men who got out of the unmarked car to be police officers, he could not "be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Florida v. Royer, supra,* 460 U.S. at 497–98, 103 S.Ct. at 1323–24. While the police certainly have a right to address proper inquiries to citizens, without articulable suspicion "the person addressed has an equal right to ignore his interrogator," *Terry, supra,* 392 U.S. at 33, 88 S.Ct. at 1885 (Harlan, J., concurring), and "may

(D.C.1975 ("[W]e eschew the notion that [seemingly innocent circumstances] assume added significance because they happen to have occurred in a high crime area. This familiar talismanic litany, without a great deal more, cannot support an inference that [an individual] was engaged in criminal conduct."); *Kenion v. United States,* 302 A.2d 723, 725 (D.C.1973) ("[E]ven though the area may have been a 'center for vice' ... that fact, without a great deal more, would not support an inference that appellant was engaged in criminal conduct.");

refuse to cooperate and go on his way." *Id.* at 34, 88 S.Ct. at 1886 (White, J., concurring). And therein lies the basic question presented for decision here: whether Bennett's decision to "go his way" by running, rather than walking, from the scene is an "articulable fact" that transforms an otherwise illegal seizure into a legal "show of authority" under *Terry.*

Courts have repeatedly rejected the suggestion that an apparent effort by an individual to avoid contact with the police is itself sufficient justification for a forcible detention of that individual. For flight is not "a reliable indicator of guilt without other circumstances to make its import less ambiguous." *Hinton v. United States,* 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969). In the absence of any underlying facts objectively warranting a reasonable suspicion of criminal activity, the defendant's "departure ... from an imminent intrusion cannot bootstrap an illegal detention into one that is legal." *People v. Aldridge,* 35 Cal.3d 473, 479, 198 Cal.Rptr. 538, 541, 674 P.2d 240, 243 (1984).

In *People v. Shabaz,* for example, 424 Mich. 42, 378 N.W.2d 451 (1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 1489, 89 L.Ed.2d 891 *cert. dismissed,* —— U.S. ——, 106 S.Ct. 3326, 92 L.Ed.2d 733 (1986), the defendant was seen in a high crime area stuffing what appeared to be a paper bag in his pants. The police, who were in an unmarked car and were not in uniform, slowed their vehicle, and when the defendant started to run the police chased him. The court suppressed a gun found in the paper bag, finding that the combination of

*Jones v. United States,* 391 A.2d 1188, 1191 (D.C. 1978) ("The fact that the officer encountered the two men during the early morning hours in an area where there had been robberies and drug trafficking certainly did not provide a basis for the 'seizure.' "). *See also Brown v. Texas, supra,* 443 U.S. at 52, 99 S.Ct. at 2641 ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.").

factors, each "capable of innocent interpretation," do not "build to form the requisite objective basis for the particularized suspicion required to justify a *Terry* stop." 424 Mich. at 64, 378 N.W.2d at 461.

> The police were not investigating a recently committed crime in the area which may have been linked to the defendant, nor was he known to the officers as a suspect in a crime. There was no contraband visible on defendant's person; the officers could only guess at the contents of the paper bag. The defendant's flight from plain-clothes pursuers in an unmarked car was at most ambiguous, and at least understandable.

*Id.* at 64, 378 N.W.2d at 461. Similarly, in *People v. Tebedo,* 81 Mich.App. 535, 265 N.W.2d 406 (1978), the defendant had run off as the police approached. A police officer gave chase, ultimately drawing his service revolver, and ordered him to halt at gunpoint. The court held:

> Flight alone does not justify an arrest, particularly when, as here, defendant's running is not flight from the scene of a reported crime. The police must positively relate the flight to commission of a crime.... That a person, doing nothing suspicious, should run at the sight of a police car does not warrant the officers in that car to pursue the individual on foot [and] to order him to halt at gunpoint ... when the only suspicious activity was the individual's flight, precipitated by the officers' initial intrusion.

*Id.* at 539–40, 265 N.W.2d at 408–09. And in *Commonwealth v. Barnett,* 484 Pa. 211, 398 A.2d 1019 (1979), the defendant ducked behind some parked cars when he saw an unmarked police car approaching, and then ran when plainclothes officers got out of the car. Since "there was nothing on which to base a belief that criminal activity was afoot, [the defendant] was free to walk away. Yet, when he attempted to leave"— by running from the scene—"the officers chased him down the street"; this chase was considered an illegal seizure and its fruits were inadmissible. *Id.* at 215, 398

A.2d at 1021. *See also McClain v. State,* 408 So.2d 721, 722 (Fla.Dist.Ct.App.) (Defendant's behavior, "taken for its most insidious implications, indicated only that he wanted to avoid police [and] could not give rise to reasonable suspicion that he was engaged in criminal activity."), *app. dism'd mem.,* 415 So.2d 1361 (Fla.1982); *People v. Terrell, supra,* 77 Mich.App. at 679, 259 N.W.2d at 189 ("Defendant's furtive gestures may have aroused police officer's general suspicion, but without some additional specific knowledge of the past of the officer, they were insufficient to justify an intrusion."); *People v. Howard, supra,* 50 N.Y.2d at 592, 430 N.Y.S.2d at 585, 408 N.E.2d at 914 (Where "there is nothing to establish that a crime has been or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit."); *Commonwealth v. Jeffries, supra,* 454 Pa. at 325, 311 A.2d at 917 ("[A]bsent some other fact[s] which could give rise to suspicion of criminal ‚conduct," flight cannot justify seizure.).

In numerous cases with similar facts, we have been extremely reluctant to permit behavior that is characterized by the police as "furtive" to justify a seizure where there is no solid grounding in articulable facts. Such "furtive" actions, like the "high crime area" factor, are properly considered as corroborating circumstances when evaluating the legality of a forcible stop. But when there is no underlying foundation of behavior that objectively creates a reasonable suspicion that an individual has engaged or is about to engage in criminal activity, the usefulness of these types of "corroborating" circumstances in determining whether a seizure is justified is minimal. *See Tyler v. United States,* 302 A.2d 748, 749 (D.C.1973) ("furtive" behavior must be "combined with other significant factors" in order to justify forcible stop). We considered this question in *Gray v. United States,* 292 A.2d 153, 156 (D.C. 1972). There, an officer observed the defendant himself passing money to another individual in a high narcotics area, and the

defendant looked around in a "furtive" manner while the money passed hands. When the police approached, one of the defendant's companions fled, and the defendant took a few steps backwards, as if to flee. We held that notwithstanding the exchange of money by the defendant, the high crime area, the flight of a companion, and the furtive gestures, the officer did not have "reasonable grounds to conclude that a narcotics transaction [wa]s taking place." *Id.* at 156. We held that a forcible stop of the defendant on these facts was therefore illegal. Judge Nebeker, concurring, tellingly observed that "the continued vitality of the holding in Terry [ ] rests on the assumption that law enforcement will sparingly use and apply the police power recognized in that decision and not attempt to disguise harassment in its mantle." *Id.* The decision in *Gray* is on all fours with this case, and accordingly governs the outcome here. As in *Gray* the question presented for decision is whether this fact pattern—an exchange of money in a high crime area and the flight of one or more of the persons involved—presents "reasonable grounds to conclude that a narcotics transaction [wa]s taking place." In *Gray,* the defendant himself handled the money, unlike Bennett. In this case, Bennett fled, unlike the defendant in *Gray.* The fact patterns are indistinguishable and the majority's attempt to differentiate the two cases—and its unwarranted intimation that *Gray* has been overruled—is unpersuasive.

*See also Tyler v. United States, supra,* 302 A.2d at 749 (forcible stop unjustified where defendant was sitting in a car in an alley, was observed to be nervous as the police approached and then attempted to conceal something under the car seat); *Jones v. United States, supra,* 391 A.2d at 1189–90 (same); *Curtis v. United States, supra,* 349 A.2d at 471 (seizure held illegal where defendant was observed walking up alley late at night in high crime area, and then made a "furtive" gesture at approach of police); *Coleman v. United States,* 337 A.2d 767, 772 (D.C.1975) (forcible stop unwarranted where defendant and companion was observed knocking on door at night in high burglary area, and hurriedly left scene at arrival of police); *United States v. Page,* 298 A.2d 233, 237 (D.C.1972) ("furtive movements standing alone would hardly warrant a search [or forcible stop] of the individual concerned"); *People v. Howard, supra,* 50 N.Y.2d at 589–90, 430 N.Y.S.2d at 583–84, 408 N.E.2d at 912–13 (police chase of defendant illegal detention where defendant was observed carrying vanity case in high burglary area and looking around in "furtive" manner, and where he took flight at approach of police).

In my view, therefore, the case law in this and other jurisdictions is contrary to the majority's position. Not one of the five decisions upholding *Terry* stops cited by the majority supports its "consciousness of guilt" generalization in this case.[4]

---

**4.** Indeed some of the cases are of no relevance or are marginally relevant at best. In *Tobias v. United States,* 375 A.2d 491, 492 (D.C.1977), the police observed the defendant giving out small objects from a shoulder bag and receiving cash in return in a high narcotics area. Officers followed him, *identified themselves as police officers,* and defendant began to run. This is a fact pattern obviously different from the instant one. *Franklin v. United States,* 382 A.2d 20 (D.C.1978), *cert. denied,* 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979), involves reported recent criminal activity and upholds the objective reasonableness of an officer's *reliance on those reports in stopping a suspect* whose actions or description seems to be consistent with involvement in that activity. This case provides no support for the majority's position. The question in *United States v. McCarthy,* 448 A.2d

267 (D.C.1982) was the legality of a warrantless search of an automobile when the police saw a marijuana cigarette in *plain view* in the car's ashtray; this case is not even arguably relevant to the issues before us today. *Smith v. United States,* 295 A.2d 64 (D.C.1972), again presents a fact pattern wholly unlike the instant one; there the police had watched the defendant and a companion walking on the street looking into parked cars for more than an hour, then lost sight of them for a time, and then observed them carrying a bag that they had not originally been carrying. Upon the approach of the *uniformed police,* the defendant's companion ran. The police asked the defendant *to halt* and to place the bag on the ground, and he did so. The bag opened and revealed a (stolen) tape deck. The relevance of this case to the issues before us is marginal, at best. Finally, the magnitude of

Had the majority made any effort to follow the instruction in *Terry* to " 'balanc[e] the need to search [or seize] against the invasion which the search [or seizure] entails," *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879 (citation omitted), it would necessarily have found that the armed pursuit conducted in this case—a chase whose ultimate goal at its inception could have been no more than a brief investigatory stop, not an arrest[5]—was unreasonable. I would affirm the decision of the trial court, and accordingly dissent.

the intrusion in the instant case—an armed chase and a forcible detention effected by a blow to the head with the butt of a service revolver—distinguishes this case from *United States v. Johnson*, 496 A.2d 592 (D.C.1985) (*Johnson II*). There, the police initially approached Johnson, who was sitting in a parked car with two other men in a "high crime" area at night, and *requested that he get out of the car* and *produce identification*. Johnson reached for a bag next to him on the seat of the car, and the police, fearing for their safety, then told them to open the bag, and when they did so, they found an unlicensed gun and ammunition. In these circumstances, the initial request by the police that Johnson produce identification was reasonable. The request that Johnson get out of the car while producing that identification may well have been an unlawful seizure of Johnson, although neither *Johnson II* nor *Johnson I* [*Johnson v. United States*], 468 A.2d 1325 (D.C.1983) directly addressed this point. The intrusion

into personal security effected by a request that someone alight from his automobile, while not insubstantial, cannot compare with the intrusion here; the Supreme Court has held, for example, that the police may order someone out of his car during even the most routine of traffic stops. *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). In this case, there was no testimony that the police asked Bennett to stop, or that they identified themselves as police officers. The armed chase of Bennett—initiated only to effect a *Terry* stop—and the method of his ultimate apprehension, are a far cry from the type of stop used in *Johnson*, and in our balancing process they require more weighty justification.

5. Immediately prior to the scuffle that led to Bennett's capture the police officer saw only that the fleeing man had stuffed "a shiny object" under a fence.