John H. SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 84–1643.

District of Columbia Court of Appeals.

Submitted Jan. 23, 1986.
Decided April 29, 1987.

Robert J. Murphy, was on the brief for appellant.

Joseph E. diGenova, U.S. Atty., with whom Michael W. Farrell, Judith Hetherton, Thomas E. Zeno, and Mark G. Gellar, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before NEWMAN and BELSON, Associate Judges, and REILLY, Senior Judge.

PER CURIAM:

Appellant was convicted, following a bench trial, of carrying a pistol without a

license, D.C. Code § 22–3204 (1981). On appeal, he asserts that the pistol should have been suppressed because the officers stopped him and seized the pistol without adequate basis, and that the evidence was insufficient to sustain his conviction. We affirm.

On March 22, 1984, an undercover officer purchased drugs from two individuals near 12th and U Streets, N.W., an area which is, according to the testimony, known for its high incidence of drug trafficking. Following the purchase, the undercover officer gave waiting arrest teams a description of the two persons from whom he purchased the drugs.

Officer Freddie Lawson, who had spent six of his sixteen years on the police force in narcotics-related activities, was a member of an arrest team. His team arrived at the scene within two minutes of the broadcast. He saw appellant conversing with the two persons who fit the descriptions of the narcotics traffickers given by the undercover policeman, and saw no one else in the immediate vicinity. Some other persons were "over on the other side of the parking lot." Lawson stopped his car and he and three other members of the team began to get out of it. Appellant started to leave at a very fast pace.

The three other officers approached the two persons who fit the descriptions given by the undercover officer. Lawson followed appellant. Thinking that appellant might have been involved in the drug transaction as the person who held the cash, and might be in possession of prerecorded funds, Lawson told appellant he was a police officer and asked him to stop. Appellant stopped and said he had nothing to do with the two people. When appellant attempted to walk away, Lawson placed his hand on appellant's shoulder. As Lawson did so, appellant spun around and swung his hand at Lawson's face. The two struggled and fell to the ground. After appellant repeatedly tried to reach for his right vest pocket, one of the other officers placed his hand on the pocket and felt the butt of a gun. A loaded .22 caliber pistol

was found in the pocket. Appellant was then placed under arrest.

Appellant moved that the gun and other evidence not pertinent here be suppressed. The judge granted the motion in other respects, but denied as to the gun in question, concluding that "under [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] it was proper to stop and search and that thereafter, the seizure was proper."

On appeal, appellant argues that the circumstances did not provide sufficient basis for a *Terry* stop. We disagree. Deeming the officer's placement of his hand on appellant's shoulder a stop under the circumstances present here, *see United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (circumstances tending to indicate a seizure include "some touching of the person of the citizen" by an officer), we are satisfied that the officer had sufficient articulable suspicion by that point to stop appellant.

We have recently noted that "in evaluating behavior for purposes of assessing whether there existed a basis for a stop or seizure, we must look to the totality of what the police observed." *United States v. Bennett*, 514 A.2d 414, 416 (D.C.1986). In this case, Officer Lawson observed these specific and articulable facts before stopping appellant: appellant was engaged in a conversation with two men who less than two minutes before had been the subjects of a radio run for a narcotics transaction; no other persons were in the immediate area; the experienced police officer was aware that narcotics sales are often made by several persons working as a team; the neighborhood was a high narcotics trafficking area; and appellant attempted to leave hurriedly when the officers suddenly appeared on the scene.

We have previously recognized the significance of several of these factors. The experience of the officer with the modus operandi of narcotics transactions is relevant to whether he made a reasonable conclusion that criminal activity was afoot; here, that appellant was likely to be involved in the transaction. *See Terry, su-*

*pra,* 329 U.S. at 23, 30, 88 S.Ct. at 1881, 1884; *see also Harris v. United States,* 489 A.2d 464, 466 (D.C.1985) (drug dealers often work in teams of two to three to minimize the dangers of robbery and arrest). The fact that this conduct occurred in a high narcotics trafficking area also increases the likelihood that it was criminal in nature. *Price v. United States,* 429 A.2d 514, 518 (D.C.1981). Furthermore, the flight of appellant when Lawson attempted to question him implies "consciousness of guilt" and weighs significantly in justifying the Fourth Amendment seizure. *Bennett, supra,* 514 A.2d at 416 (and cases cited therein). Although the matter is close, we regard the circumstances sufficient to warrant the stop.[1]

Appellant's argument that the evidence was insufficient to support guilt is without merit. *In re S.P.,* 465 A.2d 823, 826 (1983).

*Affirmed.*

NEWMAN, Associate Judge, dissenting:

"Presumptions of guilt are not lightly to be indulged from mere meetings." *United States v. Di Re,* 332 U.S. 581, 593, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948). And yet, it is implicit in the majority opinion that an entirely innocent person, by "merely meeting" with other persons suspected of criminal activity in a high-crime area, may draw enough suspicion upon himself to justify his being detained by the police. I am deeply disturbed to see the principle of guilt by association taking foothold in our Fourth Amendment jurisprudence, and must, therefore, dissent.

**I**

To justify an intrusion upon the constitutionally protected interests of a private citizen, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The majority, properly deeming Officer Lawson's act of placing his hand upon appellant Smith's shoulder to have constituted a seizure under *Terry,* points to several articulable facts which it considers to have warranted the stop: "(1) appellant was engaged in a conversation with two men who less than two minutes before had been the subjects of a radio run for a narcotics transaction; (2) no other persons were in the immediate area; (3) the experienced police officer was aware that narcotics sales are often made by several persons working as a team; (4) the neighborhood was a high narcotics trafficking area; (5) and the appellant attempted to leave hurriedly when the officers suddenly appeared on the scene." Majority Opinion at 201.

The majority's factors (2) through (5) are, at bottom, "makeweight" factors. The real issue here, of course, is Smith's presence in the parking lot with two people fitting the description given in the police lookout. This is the anchor of the "articulable suspicion" in this case, without which the other circumstances would have little importance.

In the context of probable cause for arrest, the Supreme Court has eschewed the notion of guilt by association. In *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the companion case to *Terry,* the police approached and searched Sibron for the sole reason that he had been observed talking to several known narcotics addicts over a period of eight hours. The court ruled that the heroin found in the

---

1. We find inapposite *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), on which the dissent principally relies. In *Sibron,* the suspect was observed over a period of hours conversing with several known narcotics addicts. Neither Sibron nor his companions were observed engaging in any suspicious behavior. *Id.* at 45, 88 S.Ct. at 1893. In contrast, in the instant case, Smith was seen conversing with two persons who met the description of the two individuals observed, moments before, selling

narcotics to an undercover officer. *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), also relied upon by the dissent, is not controlling here, as it dealt not with police action within a few minutes of an observed transaction, but with a search of a person who happened to be in a tavern during the execution of a search warrant issued on the basis of an informant's tip that the bartender would have heroin for sale that day.

search of Sibron's person was inadmissible against him, stating:

> It must be emphasized that Patrolman Martin was completely ignorant regarding the content of these conversations, and that he saw nothing pass between Sibron and the addicts. So far as he knew, they might indeed "have been talking about the World Series." The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.

*Id.* at 62, 88 S.Ct. at 1902.

This principle was later reinforced in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), a case involving the illegal search of a man present at a tavern in which the police were executing a warrant search of the premises, and of the bartender who was suspected of distributing heroin. Emphasizing that Ybarra made no gestures indicative of criminal conduct, made no movements suggesting an attempt to conceal contraband, and said nothing suspicious to the police officers, the court, citing *Sibron,* reiterated that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91, 100 S.Ct. at 342.[1]

Courts in other jurisdictions have been faithful to *Sibron* and *Ybarra* in rejecting probable cause and articulable suspicion arguments based upon guilt by association. *See, e.g., People v. Martin,* 32 N.Y.2d 123, 296 N.E.2d 245, 246, 343 N.Y.S.2d 343 (1973) ("mere presence at a narcotics transaction did not constitute probable cause"); *People v. Ballejo,* 114 A.D.2d 902, 495 N.Y.S.2d 75, 77 (1985) (police suspected defendant because he accompanied a person seen hiding cocaine; court held "no such inference of guilt by association is permissible"); *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973) (no probable cause for search of property belonging to other persons who happen to be present on premises being searched pursuant to warrant), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Commonwealth v. Luddy,* 281 Pa.Super. 541, 422 A.2d 601 (1980); (same; *Terry* frisk), *cert. denied,* 454 U.S. 825, 102 S.Ct. 114, 70 L.Ed.2d 99 (1981); *State v. Larson,* 93 Wash.2d 638, 642, 611 P.2d 771, 774 (1980) (parking violation by driver is insufficient grounds for *Terry* stop of passenger).

There is little precedent in this jurisdiction concerning the propriety of inferring criminal activity from association with suspected wrongdoers; the few cases which do address this issue do not support the majority's holding in this case. In *Hinton v. United States,* 137 U.S.App.D.C. 388, 424 F.2d 876 (1969), the police, on their way to execute a warrant search of an apartment for drugs, encountered Hinton and his companion, Ford, in the lobby en route to the same apartment. Ford was a known narcotics user, and a court attachment was outstanding against him. The police arrested Ford and found a loaded gun and drugs in his possession. At that point, Hinton, who had not been detained, began

---

1. The majority finds *Sibron* inapposite because, while neither Sibron nor his companions were observed engaging in any suspicious behavior, Smith was seen conversing with two persons suspected of having sold narcotics to an undercover officer moments before. Majority Opinion at 202 note 1. The majority seems to take the view that while association with drug addicts may not be grounds for suspicion, observation in the presence of suspected recent drug dealers does provide such grounds. But the Supreme Court made no such distinction in *Ybarra,* where, as in this case, the police had inferred the accused's guilt from his propinquity to a suspected drug dealer at a suspected drug distribution site.

The majority likewise seeks to distinguish *Ybarra* because the police action at issue in that case did not occur within a few minutes of a suspected drug transaction, as it did in the case at hand. This is, to my mind, a distinction without a difference. A principle that rejects guilt by association remains equally applicable whether the "propinquity" to the wrongful activity is spatial or temporal. I would venture a guess that had Ybarra been found talking with the bartender, and had the bartender been recently observed selling drugs, the result in *Ybarra* would have been the same.

to run. He was arrested and searched, and a quantity of heroin was found in his possession. Recognizing that "[c]ourts have never countenanced arrest by association," the circuit court nevertheless held that the combination of Hinton's association with Ford, his flight, and the fact that he was on his way to a suspected narcotics "pad," were sufficient to add up to probable cause for his arrest. 137 U.S.App.D.C. at 391, 424 F.2d at 879–80.

In *Hinton*, the court's reticence to countenance guilt by association was overcome by the unambiguous nature of both Hinton's own conduct and his companion's wrongdoing. Ford, after all, had just been searched and found to possess a loaded gun and heroin. Here, by contrast, at the time Smith was stopped, the two men with whom he was conversing were not known to be guilty of anything—they merely fit the description given in the radio lookout. While Hinton "bolted" when his companion was arrested, Smith's conduct in the present case was ambiguous; he left the parking lot at a walk, and may or may not have known that the man accosting him was a police officer. *See supra*, p. 203. In short, *Hinton* is not determinative here; its warning against guilt by association is of more relevance to the circumstances of this case than is its result.

This court has twice addressed seizures justified on the basis of "suspicion by association," with inconsistent results. In *Lyons v. United States*, 221 A.2d 711 (D.C. 1966), we eschewed guilt by association as a basis for probable cause to arrest. In that case, Lyons was seen in a stopped car with two other persons, one of whom, Spriggs, was known to the police as a thief and a convicted narcotics user. The police, observing the latter acting suspiciously, arrested all three occupants of the car. We held that the police had no probable cause to arrest Lyons, since "[t]here was no evidence that Lyons had any knowledge of the possession of the narcotics by Spriggs.

Lyons' only connection with Spriggs was that they were both occupants of the same car." *Id.* at 712.[2]

However, in *United States v. Johnson*, 496 A.2d 592 (D.C.1985), a *Terry*-stop case, we held that one person's flight is imputable to another if other circumstances indicate that his flight from authority implies another person's consciousness of guilt. The necessary "other circumstances" in that case was the presence of three persons (including appellant and the person who later fled) together in a damaged car at a late hour in a high crime area, justifying the police's conclusion that they were involved in a common "venture." *Id.*, 496 A.2d at 597. Judge Mack, in dissent in that case, rightfully pointed out its incompatibility with *Lyons*, and found that the majority had "confer[red] legitimacy upon an inference of guilt created entirely by association, a repugnant principle that until today has been rejected by this court." *Id.* at 600 (Mack, J., dissenting). I agree.

The majority now needlessly confers further legitimacy upon this "repugnant principle." Even on its own terms, *Johnson* no more supports the validity of Smith's seizure than does *Hinton* or any other case in our jurisdiction: Smith's mere act of conversing with suspected drug dealers, especially when eight to ten other persons were also present in the area, did not indicate that he was involved in any common venture with them. The majority's holding here finds little support in our caselaw, and is contrary to Fourth Amendment principles enunciated by the Supreme Court and followed in other jurisdictions. In my view, guilt by association must be rejected as a basis for Smith's seizure.

## II

Once the anchor of the government's "articulable suspicion" is removed, the other enumerated factors are left to float adrift. As to Officer Lawson's knowledge

---

**2.** Because *Lyons* was decided two years before *Terry*, its relevance to the *Terry*-stop situation is ambiguous. The question has provoked speculation on the part of a division of this court, the majority of which opined that applying a *Terry* analysis to the facts of *Lyons* would have changed the result, the dissenting member disagreeing. *Johnson, supra*, 496 A.2d at 598 n. 5 (majority opinion) and 600 n. 6 (Mack, J., dissenting).

that drug sales are often made in a team, this knowledge, by itself, would no more be cause to suspect Smith than anyone else in the parking lot,[3] or, for that matter, in the neighborhood. Smith was not present at the drug transaction reported by the undercover agent. The radio call which subsequently went out contained no description of anyone resembling Smith. Officer Lawson testified that he suspected Smith may have been the "juggler" or "money person," a member of a drug distribution team who may not be present at the actual transaction. But Lawson did not see Smith handle money or make any other movement or gesture which might have indicated he was the money man. *Compare United States v. Bennett,* 514 A.2d 414 (D.C.1986) (officers observed one man accepting money from another and saw appellant stick his hand into his waistband). As a factor supporting Officer Lawson's suspicion of Smith, the "money man" theory was flimsy at best. Divorced from the fact that Smith was found conversing with the other two suspects, it was of no weight at all. Officer Lawson admitted as much.[4]

Similarly, the fact that a stop occurred in a high drug trafficking area has, in some of our cases, been taken into account in determining the reasonableness of the officer's suspicion. *See, e.g., Price v. United States,* 429 A.2d 514, 518 (D.C.1981). However, we have been careful to emphasize that "[t]his familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct." *Curtis v. United States,* 349 A.2d 469, 472 (D.C.1975). For "it is necessary to remind again that thousands of citizens live and go about their legitimate day-to-day activities in areas which surface ... in court testimony, as being high crime neighborhoods. The fact that the events here at issue took place at or near an allegedly 'high narcotics activity' area does not objectively lend any sinister connotation to facts that are innocent on their face." *Bennett, supra,* 514 A.2d at 419 n. 3 (Mack, J., dissenting). *See also Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.").

Finally, as to the fact that Smith "attempted to leave hurriedly," it is true this court has recognized, "as a general proposition, that flight from authority—*implying consciousness of guilt*—may be considered among other factors justifying a *Terry* seizure." *Johnson, supra,* 496 A.2d at 597 (emphasis added) (quoting *Stephenson v. United States,* 296 A.2d 606, 609–10 (D.C.1972), *cert. denied,* 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973)).[5] But it is obvious that flight cannot imply consciousness of guilt in all cases. Flight may be inspired by innocent fear, or by a legit-

---

**3.** Although Smith was the only person standing near the two suspected subjects of the radio lookout, there were, according to Officer Lawson's testimony, eight to ten other persons in the parking lot.

**4.** The following colloquy took place on cross-examination:

Q. ... I believe that you testified that Mr. Smith was stopped because in your experience sometimes there are people who are what you call as jugglers in these transactions?

A. There are sometimes people that are called that—yes sir.

Q. And that was a possible reason for you stopping Mr. Smith, in your mind?

A. I stopped him because I feel that he might have had the prerecorded funds.

Q. But, you did not talk to any of these other eight or ten people [in the parking lot] and have any conversation with them? Did you?

A. No, sir.

Q. Could they not have had some prerecorded funds? Could they not have been jugglers?

A. They were not with the people in the lookout.

Q. So, essentially, the reason that you stopped Mr. Smith is because he was near the two people who have been described as the suspects that were involved in the drug transaction?

A. That was one of the reasons.

[T. 33–34.]

**5.** We have never, however, sustained a *Terry* stop on the basis of flight from the police *alone.* "For flight is not 'a reliable indicator of guilt without other circumstances to make its import less ambiguous.'" *Johnson, supra,* 496 A.2d at 602 (Mack, J., dissenting) (quoting *Hinton v. United States,* 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969)).

imate desire to avoid contact with the police. A citizen has as much prerogative to avoid the police as he does to avoid any other person, and his efforts to do so, without more, may not justify his detention. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) (a person approached by a police officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way."); *Brown v. Texas, supra; see also Johnson, supra,* 496 A.2d at 601 and cases from other jurisdictions cited n. 8 (Mack, J., dissenting).

To provide grounds for suspicion, therefore, the circumstances of the suspect's efforts to avoid the police must be such as "permit[ ] a rational conclusion that flight indicated a consciousness of guilt." *Lawrence v. United States,* 509 A.2d 614, 618 (D.C.1986) (Newman, J., dissenting); *Johnson, supra,* 496 A.2d at 597. Typically, in those cases in which we have found that flight indicated a consciousness of guilt, the accused clearly knew that the police were present and reacted by immediately running from the scene of the alleged crime. *See, e.g., Bennett, supra,* 514 A.2d at 414 (appellant and companion "bolted" when police car arrived); *Lawrence, supra,* 509 A.2d at 615 (appellant ran at sight of police car emergency lights); *Tobias v. United States,* 375 A.2d 491, 492 (D.C.1977) (appellant began to run when police officer identified himself as such); *Hinton, supra,* 137 U.S.App.D.C. at 391, 424 F.2d at 879 (appellant "bolted" when police searched his companion).

In several important respects, Smith's conduct after the arrival of the police did not fit the paradigm, as outlined in the above cases, of flight indicating consciousness of guilt. First, at no time did he "bolt" or run; at most, he walked at a fast pace. Officer Lawson testified that when his arrest team of plainclothes officers arrived in the parking lot where the drug sale had taken place and began to exit from their unmarked car, Smith and his companions began to disperse. Smith *walked* past the unmarked car and continued out of the driveway leading from the parking lot.

When Officer Lawson then called to him to stop, and (according to his testimony) identified himself as a police officer, Smith continued to *walk at a fast pace* until Lawson put his hand on his shoulder, making the *Terry* stop.

Second, the meaning of this "fast walk" was ambiguous under the circumstances. According to Officer Lawson's own testimony, he gave Smith no indication that he was a police officer until after Smith had left the parking lot driveway, when he called to Smith to stop. Indeed, Smith may *never* have known that these men were police officers right up until his arrest: Judge King, in finding Smith not guilty of assaulting a police officer, "was satisfied that the government ha[d] failed to prove beyond a reasonable doubt that [Smith] knew that these men were police officers." If Smith did not know that the men in the unmarked car were the police, his "fast walk" does not justify a conclusion of consciousness of guilt. *Cf. Lawrence, supra,* 509 A.2d at 618 (Newman, J., dissenting) ("if a pedestrian is not likely to know that the officer in the patrol wagon is signaling him to stop, how does his running evince a consciousness of guilt?"). Smith could not "be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Royer, supra,* 460 U.S. at 498, 103 S.Ct. at 1324 (plurality opinion). A "fast walk" could not justifiably lead to an inference of consciousness of guilt when it could be explained by equally plausible circumstances consistent with innocence: for instance, that he knew his companions to be drug dealers, and wanted to avoid the possibility of being arrested by force of his presence in the parking lot with them. "It has long been 'a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties ...'" *Hinton, supra,* 137 U.S. App.D.C. at 391, 424 F.2d at 879 (1969) (quoting *Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051 (1896)).

## III

In sum, the majority has found justification for Smith's seizure primarily in his act of conversing with other persons suspected of wrongdoing. The implications of the majority's holding are sinister: to be free from unreasonable searches and seizures, it is not enough to be law-abiding—one must also take care to associate only with "unsuspicious" persons. I fear that in continuing to sanction *Terry* seizures founded essentially upon guilt by association, the majority has further advanced a principle which has no place in Fourth Amendment jurisprudence. In my view, this "repugnant principle," properly rejected by the Supreme Court on the same day that *Terry* was decided, should be rejected by us today. For this reason, I must dissent.