**Herbert W. LAWRENCE, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 84–596.**

District of Columbia Court of Appeals.

Submitted Nov. 4, 1985.

Decided May 20, 1986.

H. Heather Shaner, Philadelphia, Pa., for appellant.

James F. Rutherford, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN and BELSON, Associate Judges, and PAIR, Senior Judge.

BELSON, Associate Judge:

Appellant Herbert W. Lawrence was convicted of carrying a pistol without a license, D.C. Code § 22–3204 (1981), possession of an unregistered firearm, *id.* § 6–2311(a), and unlawful possession of ammunition, *id.* § 6–2361(3). On appeal, he asserts that the weapon and ammunition were seized in the course of an illegal detention. Because we are satisfied that the officer who initiated the stop of appellant had the requisite articulable suspicion to do so, we affirm.

At approximately 7:40 p.m. on a Monday evening, Officer Thomas Senko of the U.S. Capital Police was patrolling in the area of Independence Avenue, S.E. in a patrol wagon. Senko first saw Lawrence as Lawrence was standing at the corner of 3rd Street, and Pennsylvania Avenue, S.E. with Barron Jackson, Lawrence's companion that evening. A few minutes later, Senko saw Jackson enter a liquor store on Pennsylvania Avenue near 2nd Street, S.E., and Independence Avenue, and exit two minutes later without having made a purchase. He rejoined Lawrence, who had been standing at the corner of 2nd and Independence.

The two men then walked past the store, turned around, and walked past the store again. His suspicions aroused, Senko called his dispatcher for a rebroadcast of the descriptions of two suspects wanted in a robbery earlier that evening. The rebroadcast indicated, *inter alia,* that the two suspects were wearing army fatigue pants;[1] Senko saw that Jackson was wearing fatigue pants. The two men appeared to notice Senko, and began to walk faster. Officer Senko then turned on his emergency lights and sounded his horn. At that, Lawrence and Jackson split up. Lawrence ran up a small drive towards the Capitol Building and Jackson went across First Street. Senko, still in his patrol wagon, tried to follow Lawrence, but was unable to do so when Lawrence ran through a wooded area on the Capitol grounds. Senko then pursued Jackson, whom he apprehended at Independence and New Jersey Avenues.

Officer Andre Fontanilla, standing at the corner of First Street and Independence, saw Officer Senko turn on his emergency equipment and saw the suspects split up. Fontanilla chased Lawrence through the wooded area, and caught up with him on the north side of Independence Avenue. The two briefly scuffled before Fontanilla subdued Lawrence. When the police searched Lawrence, they found a loaded revolver in his jacket pocket.

On appeal, Lawrence asserts that Officer Senko did not have the requisite articulable suspicion to warrant stopping him under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We disagree.

█ *Terry* established that to justify an investigative stop, the police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion. *Id.* at 21, 88 S.Ct. at 1879. We begin our analysis of this case by noting that while Lawrence and Jackson's initial activity in front of the liquor

1. The dissent relies heavily on the content of the police radio run of 7:04 p.m. on the day of the arrest. We point out that the communication was in part unintelligible.

store was sufficient to arouse Senko's suspicion, by itself it did not justify stopping them. *United States v. Barnes*, 496 A.2d 1040, 1043 (D.C.1985) (defendant's standing in front of store just before it closed, looking up and down street while companion goes in and out and confers with defendant each time, insufficient to warrant investigative seizure). This court, however, has recognized that a suspect's reaction upon seeing a police officer can be taken into account in determining the reasonableness of the stop.

Especially pertinent is our frequent recognition that "flight from authority—implying consciousness of guilt—may be considered among other factors justifying a *Terry* seizure." *Johnson v. United States*, 496 A.2d 592, 597 (D.C.1985), citing *Stephenson v. United States*, 296 A.2d 606, 609–10 (D.C.1972), *cert. denied*, 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973); *see also United States v. McCarthy*, 448 A.2d 267, 270 (D.C.1982) (flight of defendant's companion was factor justifying investigative stop of defendant); *Franklin v. United States*, 382 A.2d 20, 22 (D.C.1978) (flight from authority, first on foot, then in car, a factor in determining that there was adequate basis for stop); *Tobias v. United States*, 375 A.2d 491, 494 (D.C.1977) (several exchanges of small object in shoulder bag upon warning that police were near, and flight gave adequate basis for stop); *Smith v. United States*, 295 A.2d 64, 66 (D.C.1972) (flight following suspicious activities regarding automobiles and their contents afforded adequate basis for stop), *cert. denied*, 411 U.S. 952, 93 S.Ct. 1929, 36 L.Ed.2d 415 (1973).

Here, after Lawrence and Jackson saw Senko, they "quickened their pace," as if to leave the scene as quickly as possible without arousing the officer's suspicions. When the officer turned on his vehicle's flashing lights and sounded its horn, the two, who as pedestrians would not normally have thought that such signals from a patrol wagon were directed at them, split up, a tactic commonly used by criminals to frustrate pursuing police.[2] Lawrence's and Jackson's activities in front of the liquor store, combined with their activities upon seeing the police emergency equipment activated, provided the requisite "articulable suspicion" to warrant an investigative stop. Accordingly, the appellant's convictions are

*Affirmed.*

NEWMAN, Associate Judge, dissenting:

On November 28, 1983, at approximately 7:04 p.m., the following information was broadcast via police communications and monitored by U.S. Capitol Police Officer Thomas M. Senko:

Scout 119

119

We just had a robbery, hold-up, gun First and E Northwest

Look out two black males with army fatigue pants

No description of the weapon.

No direction of travel.

[Unintelligible] cruise

Attention all units for your information: Metropolitan responding to a robbery, armed robbery—First and E/Edward Northwest

---

2. There is a critical difference between an officer's turning his vehicle's flashing lights on to signal a motorist to stop and turning on emergency equipment to stop a pedestrian. A seizure takes place when a reasonable person would have believed he was not free to leave. *Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (White, J., plurality opinion); *see also United States v. Burrell*, 286 A.2d 845, 846 (D.C.1972). Case law from other jurisdictions indicates that when a police officer signals a motorist to stop by use

of a siren or red light, there has been a seizure which must be justified under the Fourth Amendment, *e.g., United States v. Morrison*, 546 F.2d 319 (9th Cir.1976). A pedestrian, however, who notices a patrol wagon's emergency equipment ordinarily is not likely to know that an officer is signaling for a stop until the officer communicates in a more direct manner to the pedestrian the officer's intention to stop the pedestrian. Thus, in this case, we must assess the facts known to the officer up to and including the time Lawrence began to flee.

Lookout two Negro males. Both wearing army fatigue type uniforms.

No further descriptions at this time. Subjects are armed. 19:04. *Transcript of broadcast,* Record (R.) 30.

Senko testified that approximately forty minutes later, at 2nd Street and Independence Avenue Southeast, he observed Lawrence and Jackson in the vicinity of a liquor store. Jackson entered the liquor store and came out two minutes later, apparently without having made any purchase. Jackson rejoined Lawrence who had been standing at the corner of 2nd and Independence S.E. They walked past the store, turned around and walked past it again. His suspicions aroused, Senko asked police communications for a rebroadcast of the description of the robbery suspects. The following is a transcript of this communication:

123

123

Got two persons one hundred block Independence southeast.

unintelligible

One's wearing green fatigues.

One's wearing tennis shoes.

I'm gonna stop them. Need back-up.

123—What's the one wearing green fatigues—the one wearing tennis shoes—what type of clothes, other clothes does he have on besides tennis shoes?

He's got on a brown jacket. The other one's got a brown jacket on, blue [unintelligible,] a red white and blue knit cap. I'm gonna check em out anyway.

He's got on tennis shoes with stars on them.

118 We'll back em up.

119 You're also available. 19:47. *Id.*

Senko testified that he turned on his emergency lights and sounded his horn. He said: "[a]t that point they the two subjects started to jog away from my location." Tr. 8.

The content of the police report of the armed robbery, as it pertained to the description of the perpetrators, was read into the record by counsel for Lawrence, without objection. This description was "... two black males, the first 27 to 32, six foot, one inch, one hundred ninety, black hair, medium complexion, wearing a black skull cap, a green jacket, and green pants. The second was a black male, age 18, six foot one, one hundred seventy, dark complexion, wearing a green jacket and green pants." Tr. 25.

During the suppression hearing, Senko testified that the broadcast he monitored "was for two black males wearing Army fatigues. One of the black males had tennis shoes with stars on them." Tr. 6. He testified that the "defendant was wearing a brown jacket, looked like a military style jacket from when I observed it, and was also wearing tennis shoes with stars on them." Tr. 6. Senko's testimony, corroborated by U.S. Capitol Police Officer Fontenilla, that the "tennis shoes with stars on them" was part of the description as broadcast is belied by the transcript of both broadcast set out above. Further, the police report containing the description given to the police by the victim of the armed robbery contains nothing about footwear. Tr. 25. Jackson, when called as a witness by Lawrence, denied that Lawrence was wearing white sneakers or any footwear with stars on them. Tr. 28.

No party contended in the trial court or in this court, that the record before us contains less than the full descriptions broadcast or that the excerpt of the police report of the armed robbery concerning the description is incomplete in any manner.[1] Thus, we are confronted with the following saga. A member of the U.S. Capitol Police heard a broadcast of a description of "two black males with ... army fatigue type uniforms", R. 30, having committed an armed robbery at 1st and E Streets, N.W. at approximately 7:00 p.m. Approximately 40 minutes later, and at least ten blocks away, the officer observed two black

---

1. In light of this, I am unable to fathom how the majority finds comfort (as they appear to do in note 1, *supra*) from the "unintelligible" portions of the radio transcript.

males, one who had on green fatigues, the other wearing a brown jacket. When he became suspicious of them after one entered a liquor store without making a purchase and both of them walked by the liquor store twice, he asked police communication to rebroadcast the description of the armed robbers. Without receiving any further description, he decided that he was "gonna check them out anyway." R. 30. He turned on his emergency lights and sounded his horn. The two black males began running. (Jackson testified that he and Lawrence had been jogging prior to noticing Senko and continued to do so afterwards.)

I recognize that on this appeal, we must view the evidence in its light most favorable to the government. *Jones v. United States*, 477 A.2d 231, 236 (D.C.1984). However, neither we nor the trial court should give credence to testimony of police officers concerning the description broadcast of certain suspects where the complete transcript of that broadcast provided by the government to the court flatly contradicts that testimony. Here both officers testified that the broadcast made reference to white tennis shoes bearing stars and that Lawrence was wearing such footwear. The transcript of both broadcasts (as well as the description contained in the police report of the armed robbery), make no mention of any type footwear. At best, the officers were mistaken. At worst ...?

While ignoring the evidence indicating that the officers' testimony was at least mistaken, the majority seeks to justify the seizure of Lawrence based on flight. The majority correctly cites cases where we have considered flight in the calculus evaluating the propriety of a stop or seizure. However, those cases involved circumstances where the evidence of flight permitted a rational conclusion that flight indicated a consciousness of guilt. Interestingly, the majority says at note 2, *supra:*

> There is a critical difference between an officer's turning his vehicle's flashing lights on to signal a motorist to stop and

turning on emergency equipment to stop a pedestrian. A seizure takes place when a reasonable person would have believed he was not free to leave. *Florida v. Royer*, 460 U.S. 491, 501–02 [103 S.Ct. 1319, 1326, 75 L.Ed.2d 229] (1983) (White, J., plurality opinion); *see also United States v. Burrell*, 286 A.2d 845, 846 (D.C.1972). Case law from other jurisdictions indicates that when a police officer signals a motorist to stop by use of a siren or red light, there has been a seizure which must be justified under the Fourth Amendment, *e.g.*, *United States v. Morrison*, 546 F.2d 319 (9th Cir.1976). A pedestrian, however, who notices a patrol wagon's emergency equipment ordinarily is not likely to know that an officer is signaling for a stop until the officer communicates in a more direct manner to the pedestrian the officer's intention to stop the pedestrian. Thus, in this case, we must assess the facts known to the officer up to and including the time Lawrence began to flee.

The majority fails to appreciate the impact of what they have correctly said, i.e., if a pedestrian is not likely to know that the officer in the patrol wagon is signaling him to stop, how does his running evince a consciousness of guilt? For me, the majority's answer that the two men split up, thereby evincing criminal behavior, is no answer.

This city once condoned arrest for investigation. The practice has been condemned. *Report and Recommendation of the Commissioners' Committee on Police Arrests For Investigation* (D.C. July 1962). Its use was stopped. *Memorandum Order* No. 15, Series, 1963, Metropolitan Police Department, March 12, 1963. The invalidity of such arrest has been judicially declared. *Davis v. Mississippi*, 394 U.S. 721, 726–27 [89 S.Ct. 1394, 1397, 22 L.Ed.2d 676] (1969); *Mallory v. United States*, 354 U.S. 449, 456 [77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479] (1957); *Gatlin v. United States*, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963); *Bynum v. United States*, 104 U.S. App.D.C. 368, 262 F.2d 465 (1958). I fear

that by a misuse of *Terry v. Ohio*, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), the majority is again breathing life into this condemned and invalid practice. I hope future events prove me wrong.

I dissent.