532 A.2d 138 (1987)
In re D.J., Appellant.
No. 85-870.
District of Columbia Court of Appeals.
Argued October 1, 1986.
Decided October 19, 1987.
*139 David Handzo, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.
Charlotte Brookins-Pruitt, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee.
Before NEWMAN, BELSON and TERRY[*], Associate Judges.
NEWMAN, Associate Judge:
Appellant D.J., a juvenile, was adjudged delinquent for possession with intent to distribute phencyclidine (PCP) and marijuana (D.C. Code § 33-541(a) (1986 Supp.)). Before trial, D.J. moved to suppress evidence and statements on the ground that both were obtained by police subsequent to an unconstitutional search and seizure. After an evidentiary hearing, the motion was denied. The evidence adduced at the hearing became the basis for a stipulated trial; D.J. was found guilty of the charged offenses. D.J. appeals the denial of his motion to suppress evidence. We reverse.

I
On a rainy evening in March, 1985, D.J. stood near the curb in the 300 block of 53rd St., N.E., Washington, D.C. He was two and one-half blocks from his home. An unmarked police car approached. The officers inside, Sergeant Miller and Lieutenant Andes, were on narcotics detail and had just monitored a lookout broadcast. D.J. did not match the description given in the broadcast. Neither Miller nor Andes had ever seen him before. As the car drew closer, D.J. made eye contact with Sergeant Miller. D.J. turned, placing his hands in his pockets, and began walking in the direction opposite to that in which the car was headed. Miller told Lieutenant Andes, driver of the car, to back up. Andes tracked D.J. in reverse gear at a pace of 15-20 miles per hour. When the car came abreast of D.J., he turned again and proceeded back in the direction from which he had come, still walking. The car again pursued him. When the car met him, D.J. once again reversed direction, and the police car again followed. At this point, Miller radioed to a second police car carrying Officer Joe Gray and his partner. He informed Gray that D.J. was walking in his direction, intending by this communication to have Gray stop D.J.
As the unmarked car approached D.J. for the third time, Lieutenant Andes stopped the car. Miller got out and started walking toward D.J. D.J. began to run; Miller ran after him. When D.J. reached the corner he encountered Officer Gray, who had just pulled up and gotten out of his cruiser. D.J. turned around, only to find himself face-to-face with Sergeant Miller, five or six feet in front of him.
At this point, Miller, according to his account, saw D.J.'s hand emerge from his pocket holding a brown vial of the type often used to store packets of PCP. Miller ordered D.J. to freeze. D.J. dodged Miller and ran past him, still holding the brown vial. Miller gave chase on foot. D.J. was finally stopped by a third pair of officers, Campbell and Ortiz. D.J. exclaimed, "Okay, you got me. I'm dirty." He was placed on the ground and searched. Police confiscated a brown vial holding 11 foil packets of marijuana laced with PCP, a manila envelope containing marijuana, and $63 in currency.
D.J. testified to essentially the same facts as did Sergeant Miller, with one exception: he denied ever having pulled the brown vial containing PCP out of his pocket, maintaining that it had remained in the inside pocket of his jacket throughout the incident until his capture and the ensuing search.
The motions judge did not resolve the factual dispute as to whether or not the brown vial had become visible before the *140 search. He ruled that a Terry stop occurred at the point when Sergeant Miller first began to chase D.J. on foot. He also held that at that point, D.J. had given police articulable cause for suspicion, partly by putting his hands in his pockets upon first seeing the police, but primarily by repeatedly attempting to evade them. Though troubled by the implications of his holding upon the citizen's right to avoid contact with the police, the motions judge nevertheless denied the motion to suppress, remarking that it was a close case upon which he "could have gone both ways." We hold that he went the wrong way.

II
Before reaching the question of whether, in appellant D.J.'s encounter with the police, his Fourth Amendment right "to be secure . . . against unreasonable searches and seizures" was violated, "[o]ur first task is to establish at what point in this encounter the Fourth Amendment becomes relevant." Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). The Supreme Court has made clear that a seizure has occurred when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Id. at 19 n. 16, 88 S.Ct. at 1879 n. 16. The police violate no constitutional rights by merely making inquiries.
As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification. . . . [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.
United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (footnote omitted).
Reviewing the facts of this case, we conclude that a seizure occurred, at the latest, when Sergeant Miller began to chase D.J. on foot.[1] "A police pursuit is a show of authority . . ." United States v. Bennett, 514 A.2d 414, 418 (D.C. 1986) (Mack, J., dissenting). By taking up pursuit, the police communicated emphatically to D.J. that he was not free to leave. This was a communication that no reasonable person could have misinterpreted. A person pursued by the police knows, or reasonably should know, that the object of chase is capture. He knows also that in effecting his capture, the police will resort to physical force if necessary. When the chase commences, the stop has begun.
Courts in other jurisdictions have considered the commencement of a police pursuit to be a seizure under the Fourth Amendment. See Commonwealth v. Thibeau, 384 Mass. 762, 764, 429 N.E.2d 1009, 1010 (1981) ("Pursuit that appears designed to effect a stop is no less intrusive than a stop itself . . . [A] stop starts when pursuit begins."); People v. Thomas, 660 P.2d 1272, 1275 (Colo.1983) (en banc) (officers must have reasonable suspicion at the inception of the pursuit, and may not rely on facts observed during the chase to justify seizure); People v. Terrell, 77 Mich.App. 676, 680, 259 N.W.2d 187, 189 (1977); State v. Saia, 302 So.2d 869, 873 (La.1974), cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975). We follow their lead, and hold that the initiation of a police chase such as occurred here constitutes a "seizure" for Fourth Amendment purposes.[2]
*141 In this case, seizure occurred, at the latest, when Sergeant Miller began to chase D.J. on foot.

III
To justify a particular intrusion upon a citizen's constitutionally protected interests, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, supra, 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted). The motions judge ruled that the police intrusion in this case was justified by suspicion engendered by D.J.'s attempts to avoid the police officers, as well as by his putting his hands in his pockets. On appeal, the government offers additional articulable facts, citing D.J.'s presence in a "high narcotics area" and Sergeant Miller's experience in narcotics enforcement. We will examine these facts individually.
We have recognized, "as a general proposition, that flight from authority implying consciousness of guiltmay be considered among other factors justifying a Terry seizure." United States v. Johnson, 496 A.2d 592, 597 (D.C.1985) (emphasis added), citing Stephenson v. United States, 296 A.2d 606, 609-10 (D.C.1972), cert. denied, 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973). However, the circumstances of the suspect's efforts to avoid the police must be such as "permit[] a rational conclusion that flight indicated a consciousness of guilt," Lawrence v. United States, 509 A.2d 614, 618 (D.C.1986) (Newman, J., dissenting), and the evasive action must be accompanied by other factors warranting an intrusion.
To begin with, we doubt that D.J.'s behavior was of the sort which could give rise to a rational inference of consciousness of guilt. Assuming, without deciding, that he knew Miller and Andes were police officers,[3] his conduct, in itself, was not the kind of flight from authority which we have typically found to create an "articulable suspicion." In cases in this jurisdiction in which flight has been considered an indication of guilty conscience, the accused reacted by immediately running from the police. See Bennett, supra, 514 A.2d at 414 (appellant and companion "bolted" when police car arrived); Lawrence, supra, 509 A.2d at 615 (appellant ran at sight of police car emergency lights); Tobias v. United States, 375 A.2d 491, 492 (D.C.1977) (appellant began to run when police officer identified himself); Franklin v. United States, 382 A.2d 20, 21 (D.C.1978) (appellants fled in car after officer identified himself), vacated in part on other grounds, 392 A.2d 516 (D.C.1978), cert. denied sub nom. Dickerson v. United States, 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979); Hinton v. United States, 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969) (appellant "bolted" when police searched his companion).
D.J.'s reaction to the presence of the police was different. He did not break into a sprint upon the first approach of the police car. Instead, he merely attempted to walk away, behavior indicative simply of a desire not to talk to the police. No adverse inference may be drawn from such a desire. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
Citizens have no legal duty to talk to the police. See Cobb v. Standard Drug Co., 453 A.2d 110, 112 (D.C.1982). Law enforcement officers, like anybody else, may approach an individual in a public place and put questions to him if he is willing to listen. "The person approached, however, need not answer any question put *142 to him; indeed, he may decline to listen to the questions at all and may go on his way. . . . He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) (citations omitted); Brown v. Texas, supra, 443 U.S. at 52, 99 S.Ct. at 2641; United States v. Barnes, 496 A.2d 1040, 1044 n. 9 (D.C.1985). A refusal to listen or answer may take verbal form, or, it may, as in the present case, take the form of physical departure. See People v. Howard, 50 N.Y.2d 583, 586, 430 N.Y.S.2d 578, 581, 408 N.E.2d 908, 910 (person questioned by police may remain silent or walk or run away), cert. denied, 449 U.S. 1023, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980). In either case, it may be inspired by any number of innocent reasons.[4] Such ambiguous conduct may not serve, of itself, as a basis for seizure. See Wong Sun, supra note 4, 371 U.S. at 484, 83 S.Ct. at 415; People v. Aldridge, 35 Cal.3d 473, 479, 198 Cal.Rptr. 538, 541, 674 P.2d 240, 243 (1984) en banc ("departure . . . from an imminent intrusion cannot bootstrap an illegal detention into one that is legal."). To permit such justification would be effectively to create a duty to respond to the police, and would seriously intrude upon the liberty and privacy interests which the Fourth Amendment was designed to protect.
For these reasons, courts in this jurisdiction have long adhered to the principle that flight is not "a reliable indicator of guilt without other circumstances to make its import less ambiguous." Hinton, supra, 137 U.S.App.D.C. at 391, 424 F.2d at 879. In accordance with this principle, we have sustained findings of reasonable suspicion based upon flight only when other circumstances were present to justify an inference that criminal activity was afoot.[5]
We hold, as our past cases have indicated, that an attempt to evade the police, without more, is insufficient grounds to justify a Terry stop. Such conduct on the part of a suspect must be "corroborated by other suspicious circumstances. . . ." Watkins v. State, 288 Md. 597, 603-04, 420 A.2d 270, 273 (1980). We are in agreement with courts in other jurisdictions which, faced with facts similar to those presented in this case, have reached the same conclusion.[6]
The government claims that other circumstances were present which, when combined with D.J.'s evasive maneuvers, raised sufficient cause for suspicion to justify a Terry stop. We find these other circumstances of no significance. Putting one's hands in one's pockets, for example, *143 is a universal action which could hardly be called suspicious, especially on a rainy evening in March.
The experience of a police officer with the modus operandi of narcotics transactions is sometimes relevant to whether he made a reasonable conclusion that criminal activity was afoot. Bennett, supra, 514 A.2d at 416 (where police sighted four men in alley, saw money change hands, and saw one man putting hand in waistband, officer's suspicion aroused because he knew from experience that drug traffickers often work in pairs, one holding the money, the other holding the drugssometimes in his pants). However, none of D.J.'s actions neither his putting his hands in his pockets, nor his walking away from the policecan be deemed sufficiently sinister in character, even to an experienced police officer, to transform this stop into a valid one.
Similarly, although the fact that a stop occurred in a "high narcotics area" has sometimes been considered along with other factors in determining the reasonableness of the officer's suspicion, see, e.g., Price v. United States, 429 A.2d 514, 518 (D.C.1981), we have emphasized that "[t]his familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct." Curtis v. United States, 349 A.2d 469, 472 (D.C.1975). D.J. lived less than three blocks from the place where he was stopped. Thousands of persons live and go about their legitimate business in areas which are denoted "high narcotics areas" by police. Innocent activities do not become sinister by the mere fact that they take place in one of these areas. See Brown, supra, 443 U.S. at 52, 99 S.Ct. at 2641 ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.").
We conclude that the investigative stop in this case was not warranted by the totality of the facts articulated by the government. The trial court therefore erred in denying D.J.'s motion to suppress; its judgment must be reversed.
NOTES
[*] Hubert B. Pair, Senior Judge, was originally a member of this division. Judge Terry was drawn to replace him pursuant to the Internal Operating Procedures of this court.
[1] The motions judge found, and the government has conceded at oral argument on appeal, that the Terry stop occurred at the commencement of the footrace. D.J. contends that the stop occurred at some unspecified point earlier in the encounter, when, by continually "stalking" his movements in their car, the police led him to reasonably believe that he was not free to leave. It might be difficult to pinpoint exactly when, if ever, during this gradually escalating encounter, a reasonable person would feel he was no longer free to decline contact with the police. Fortunately, we find it unnecessary to do so in order to decide this case. We leave the question open, deciding only that the seizure occurred, at the latest, when Sergeant Miller began to give chase on foot.
[2] This issue has not heretofore been decided in this jurisdiction. In Bennett, supra, we left this question open, since we did not need to reach it in order to decide that case. 514 A.2d at 415 n.2.
[3] Whether there was sufficient basis for a Terry stop is in each case an inquiry based on an objective view of the facts as the police officer knew them at the time of the seizure. Coleman v. United States, 337 A.2d 767, 769 (D.C.1975). At the time they were pursuing D.J., Sergeant Miller and Lieutenant Gray were in plainclothes and were driving an unmarked car. See United States v. Jones, 619 F.2d 494, 498 (5th Cir.1980) (plainclothes police officer could not reasonably have concluded that the accused knew he was being pursued by a policeman, and therefore, was unjustified in treating the flight as a suspicious circumstance supporting a Terry stop.)
[4] An individual may be motivated to avoid the police by a natural fear or dislike of authority, a distaste for police officers based upon past experience, an exaggerated fear of police brutality or harassment, a fear of being apprehended as the guilty party, or other legitimate personal reasons. See Wong Sun v. United States, 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 415 n. 10, 9 L.Ed.2d 441 (1963); Alberty v. United States, 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051 (1896).
[5] See, e.g., Bennett, supra, 514 A.2d at 414-15 (in addition to flight, police observed what appeared to be drug transaction); Lawrence, supra, 509 A.2d at 615 (two men appeared to be casing a liquor store, and partially matched police lookout description); Johnson, supra, 496 A.2d at 594 (type of car, number of men in it, lateness of the hour, location were factors heightened by flight of driver); Tobias, supra, 375 A.2d at 494 (appellant seen selling objects to several persons on street, then fled at sight of police); see also Hinton, supra, 137 U.S.App.D.C. at 390, 424 F.2d at 878 (appellant, en route to narcotics "pad" with companion, fled when search of companion revealed drugs).
[6] See People v. Shabaz, 424 Mich. 42, 64, 378 N.W.2d 451, 461 (1985), cert. granted, 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 733, cert. dismissed, ___ U.S. ___, 106 S.Ct. 3326, 92 L.Ed.2d 733 (1986); People v. Tebedo, 81 Mich.App. 535, 539, 265 N.W.2d 406, 408-09 (1978); Thibeau, supra, 384 Mass. at 764-65, 429 N.E.2d at 1010; Commonwealth v. Barnett, 484 Pa. 211, 214-15, 398 A.2d 1019, 1021 (1979); Commonwealth v. Jeffries, 454 Pa. 320, 325, 311 A.2d 914, 917 (1973); McClain v. State, 408 So.2d 721, 722 (Fla.Dist.Ct.App.), petition for review dismissed, 415 So.2d 1361 (Fla.1982); People v. Howard, supra, 50 N.Y.2d at 592, 430 N.Y.S.2d at 585, 408 N.E.2d at 914; People v. Fox, 97 Ill.App.3d 58, 64, 421 N.E.2d 1082, 1086 (1981); Thomas, supra, 660 P.2d at 1276; Jones, supra note 3, 619 F.2d at 498; see also Watkins, supra, 288 Md. at 603-04, 420 A.2d at 273-74, and cases cited therein.