**John Thomas PEAY, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–678.

District of Columbia Court of Appeals.

Submitted Feb. 8, 1990.
Decided May 23, 1990.

John M. Copacino, Washington, D.C., and Shailly P. Agnihotri, New York City, Georgetown Criminal Justice Clinic, on the brief, for appellant.

Jay B. Stephens, U.S. Atty., and John R. Fisher, Washington, D.C., Thomas J. Hibarger, and Robert C. Little, Asst. U.S. Attys., on the brief, for appellee.

Before NEWMAN and FERREN, Associate Judges, and PRYOR, Senior Judge.

NEWMAN, Associate Judge:

John Thomas Peay appeals his conviction for possession of marijuana with intent to distribute in violation of D.C.Code § 33–541(a)(1) (1988) on grounds that evidence seized from him and admitted against him at trial was seized in violation of the Fourth Amendment of the United States Constitution. Specifically, Peay charges that the evidence, consisting of several plastic bags of marijuana, was seized by an officer who, without proper justification, ordered him to stop. Because we conclude as a matter of law that the officer lacked a reasonable articulable suspicion that Peay was engaged in criminal activity when he ordered Peay to stop, we reverse.

I.

According to the testimony of Emmett G. Queen, on the afternoon of January 26, 1988, Queen and two other plainclothes officers of the Metropolitan Police Department were on routine patrol in the 1400 block of Girard Street, N.W., when they parked their vehicle in front of a building known to the officers as a place where illegal narcotics were sold.[1] There they observed John Thomas Peay standing in the doorway to the building. As they exited the car to begin their routine check of the building for illegal narcotics sales, they saw Peay look in their direction before hurrying into the building.

---

1. Officer Queen, the only officer to testify at the suppression hearing, could not recall whether the vehicle was marked or unmarked.

Queen went immediately to the third floor to begin his part of the routine check. There in the third floor hallway, he encountered Peay standing about three feet away in good light. Peay was clutching something in his left hand, and Queen testified that he thought it might be "a weapon, a small knife, possibly a gun." Queen identified himself as a police officer, then approached Peay and asked what was in his hand. Peay turned and began to walk away. Queen ordered Peay to stop. Peay continued walking, and Queen ran towards him and grabbed him by the shoulder, at which time Peay dropped several small plastic bags containing a greenish weed. Another officer arrived and the contents of the plastic bags were field tested. When the contents of the bags proved to be marijuana, Peay was placed under arrest. He was subsequently charged with possession of marijuana with intent to distribute.

Peay moved for suppression of the bags of marijuana at a pre-trial hearing, arguing that police had begun to pursue him from the moment they first saw him standing outside the building, at which point in time they lacked a reasonable articulable suspicion that would justify seizing him. When the trial court rejected his interpretation of events, concluding instead that the police had entered the building not to chase Peay but on routine patrol, Peay argued that Queen did not have a reasonable articulable suspicion when he stopped Peay in the third floor hallway, since Queen admitted he had no idea what Peay had in his hand. The trial court rejected his argument as well, holding that Queen did indeed have a reasonable articulable suspicion. As the trial court put it:

> I also find that if there was a stop here—and I'm not certain that there was—there was an articulable suspicion upon which to base the stop, which included more than this being a building where the police officer testified there was a traffic in narcotics.

> The activity of the defendant prior to the actual question which was lodged by the police officer, was such that when the police officer saw that the defendant had something in his hand, he could reasonably have a suspicion of there being a problem. Therefore, when he said, "Stop. What is in your hand?" he was indeed minimizing the impact of this stop, if indeed it was a stop, and he was minimizing it to the point where he was addressing what for him was an articulable suspicion of criminal activity and danger to himself.

> He and two other officers were in a building where they knew there was a traffic in drugs, and they also know of the dangers to their own safety inherent in drug trafficking and being in areas where drugs are being sold.

On appeal, Peay has abandoned his argument that a chase ensued from the moment he entered the building. Moreover, the government concedes that Queen conducted a stop within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) by ordering Peay to stop. This concession was proper. *See Michigan v. Chesternut*, 486 U.S. 567, 573–74, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988); *Smith v. United States*, 558 A.2d 312, 314 (D.C.1989) (en banc). Because we hold that prior to observing Peay's clenched fist Queen had no justification for conducting a *Terry* stop, the only issue we face is whether the trial court erred in holding that Queen had justification for a *Terry* stop after observing Peay's clenched fist.

## II.

We begin with a fundamental premise expressed in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971):

> the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 [88 S.Ct. 507, 514, 19 L.Ed.2d 576] (1967). The exceptions are "jealously and carefully drawn," *Jones v. United States*, 357 U.S. 493, 499 [78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514] (1958), and there

must be "a showing by those who seek exemption ... that the exigencies of the situation made that course imperative." *McDonald v. United States*, 335 U.S. 451, 456 [69 S.Ct. 191, 193, 93 L.Ed. 153] (1948). "[T]he burden is on those seeking the exemption to show the need for it." *United States v. Jeffers*, 342 U.S. 48, 51 [72 S.Ct. 93, 95, 96 L.Ed. 59] (1951).

*Id.* at 454–55, 91 S.Ct. at 2031–32.

■ One of the "specifically established and well-delineated exceptions" was created in *Terry v. Ohio, supra*, 392 U.S. 1, 88 S.Ct. 1868. Under the *Terry* exception, in order to justify forcibly stopping a citizen, an officer "must be able to point to specified and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. The definition of what constitutes articulable suspicion necessarily has depended upon the facts available to the officer in each of the particular situations that have come up for review. Nonetheless, we have expressed general principles to be followed in reviewing the nexus between available facts and the inference drawn from them. For example, in *Stephenson v. United States*, 296 A.2d 606 (D.C.1972), *cert. denied*, 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973), we identified the following factors:

(1) the particular activity of the person stopped for questioning which the investigating officer has observed, (2) that officer's knowledge about (a) the activity and the person observed and/or (b) the area in which the activity is taking place, and (3) the immediate reaction or response of the person approached and questioned by the officer.

*Id.* at 609. Moreover, we have said that in reviewing the judgments of police officers making such stops in the field, we must consider the "totality of what the police observed." *United States v. Bennett*, 514 A.2d 414, 416 (D.C.1986). *See, also, United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) ("the totality of the circumstances—the whole picture—must be taken into account.").

However, we have also made clear that there must be more than mere suspicions or hunches to justify such a stop. *See Jones v. United States*, 391 A.2d 1188, 1191 (D.C.1978); *Coleman v. United States*, 337 A.2d 767, 772 (D.C.1975). As Justice Harlan put in his concurring opinion in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), which was handed down the same day as *Terry:*

There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests *particular criminal activity*, completed, current, or intended. (Emphasis added).

*Id.* at 73, 88 S.Ct. at 1907. Further, the subjective belief of the police officer must be an objectively reasonable one, *Terry, supra*, 392 U.S. at 21–22, 88 S.Ct. at 1879–1880 for "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964). And here is the heart of the matter before us: whether the facts available to Officer Queen, taken in the totality of the circumstances before him, justified an objectively reasonable and articulable suspicion that Peay was engaging or had engaged in "particular criminal activity."

■ At the suppression hearing, Queen articulated his suspicion to be that Peay was engaged in carrying and concealing "a weapon, a small knife, possibly a gun." Such activity is proscribed by D.C.Code § 22–3204 (1989 Repl.), which provides in relevant part:

No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed.

and by D.C.Code § 22–3214 (1989 Rep.), which provides in relevant part:

(a) No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or.... switchblade knife....

(b) No person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than three inches, or other dangerous weapon.

Since Queen testified in the disjunctive, stating that he believed Peay's clenched hand might conceal "a small knife, possibly a gun," we will consider the effect of these statutes on both of these suspicions in turn.

### Queen's suspicion that Peay carried a gun.

Although § 22–3204 could apply to a gun concealed in Peay's hand, and thus provide the necessary legal basis for Queen's suspicion that Peay was engaged in criminal activity, there was no objectively reasonable basis for concluding that Peay was so engaged. We know of no pistol so small as to permit such concealment from a trained police officer standing three feet away in a well-lit hallway. We reach the same conclusion regarding the possibility that Peay was concealing an imitation pistol, as prohibited by § 22–3214. Furthermore, it was unreasonable for Queen to believe that Peay might have been in violation of § 22–3214 by carrying any of the other guns mentioned in the statute, specifically machine guns and shotguns. Therefore, we hold that Officer Queen's suspicion that Peay was involved in the type of criminal activity proscribed by §§ 22–3204 and 22–3214 with respect to guns was not reasonable under the totality of the circumstances and, thus, afforded him inadequate justification for a *Terry* stop.

### Officer Queen's suspicion that Peay carried a small knife.

Of the knives listed in §§ 22–3204 and 22–3214, only the possession of a switch-blade is a strict liability offense; that is, it requires no intent. All other knives described in the two statutes require possession with intent to use unlawfully against another.

As was the case concerning Queen's suspicion that Peay's clenched hand concealed a gun, we hold that any belief that Officer Queen may have had that Peay could conceal a switchblade in a clenched hand in a well-lit hallway when Queen was standing three feet away was unreasonable. Besides, Queen stated that he suspected the presence of a "small knife," which would for all practical purposes rule out a switchblade. Furthermore, this description would very likely rule out as well a dirk, dagger, stilletto, razor, or knife with a blade longer than three inches.

But even if such knives might fit within Peay's clenched hand, possession of them, without more, would not be enough to violate § 22–3214, because the statute requires that such possession be "with intent to use unlawfully against another." Queen did not testify that he suspected Peay of harboring such intent. But even if it can be inferred that Queen did form such a suspicion, we hold that there was no reasonable basis to support it. When Queen inquired about the contents of Peay's clenched fist, Peay turned and walked away. Even when Queen ordered Peay to stop, Peay continued to walk away. Under such circumstances we hold as a matter of law that there was no reasonable basis for suspecting that Peay harbored an intent to use whatever knife may have been concealed within his clenched hand as a weapon unlawfully against another. Thus, Queen's suspicion that Peay was in violation of § 22–3214 was not reasonable.[2]

Finally, there is the category of knives that may fit the category of "deadly or dangerous weapons capable of being so concealed" described in § 22–3204. Our decisions defining which knives constitute "deadly or dangerous" weapons have focused upon the intent of the person carry-

---

**2.** Unlike our dissenting colleague, we are unwilling to sanction a Fourth Amendment intrusion, using a *Terry* justification, on the possibili-ty that, given the locale, Peay intended to use the "small knife" unlawfully someday against somebody.

ing the knife, as well as upon the size or type of knife carried. Thus, a kitchen knife can be a deadly and dangerous weapon when carried as a weapon. *Clarke v. United States*, 256 A.2d 782 (D.C.1969). The same is true of a hawk-bill knife. *Perry v. United States*, 230 A.2d 721 (D.C. 1967). A knife that is ten-inches long when extended, with a blade slightly over four-inches long, may also fit the statutory definition. *Scott v. United States*, 243 A.2d 54 (D.C.1968). In the end, the test for determining dangerousness is the purpose for which the knife is carried. *Nelson v. United States*, 280 A.2d 531 (D.C.1971); *Clarke, supra,* 256 A.2d 782; *Leftwitch v. United States,* 251 A.2d 646 (D.C.1969). Of course, the carrying of a knife for a legitimate purpose is not prohibited by the statute. *Scott, supra,* 243 A.2d 54.

Thus, Queen's bare suspicion that Peay's clenched hand might conceal a knife fitting the description of deadly or dangerous weapons in § 22–3204, without more, was not enough to bring Peay's conduct within the purview of the statute. As is the case concerning knives described in § 22–3214, possession must be accompanied by intent; in this case the requisite intent is to use the knife unlawfully as a weapon. Having held that there was no reasonable basis for suspecting that Peay had the intent to use the "knife" unlawfully within the meaning of § 22–3214, we reach the same conclusion under § 22–3204.

Thus, we hold as a matter of law that Officer Queen did not have a reasonable articulable suspicion for stopping Peay in the hallway. We reverse his conviction and remand for further proceedings consistent with this opinion.[3]

*Reversed and remanded.*

FERREN, Associate Judge, dissenting:

The sole issue on appeal is whether Officer Queen had a reasonable, articulable suspicion of criminal activity within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), when he stopped appellant in the hallway of a build-

ing known for drug sales, believing he saw appellant clutching something that might be a weapon. The trial court assessed Officer Queen's testimony and concluded the officer had such a reasonable suspicion. The majority today reverses that ruling in a decision that turns—improperly—on appellate court fact-finding. My colleagues use words such as "unreasonable" to mask the fact that they essentially make a credibility determination, effectively discrediting Officer Queen's articulated suspicion that appellant was clutching a weapon (a knife or gun). The majority's actions are particularly inappropriate in light of the fact that defense counsel did nothing at the suppression hearing to demonstrate that it would have been unreasonable for Officer Queen to have suspected a concealed weapon. Indeed, that was not even an issue contested at the hearing. Thus, I do not understand how my colleagues can reverse essentially on a factual ground that did not even suggest itself to those—including appellant's own counsel—who heard the testimony first-hand. Based on a legal analysis which I elaborate below, I would sustain the denial of appellant's motion to suppress and thus would affirm his conviction.

## I.

As the majority states, in order to justify intruding upon constitutionally protected interests by compelling a citizen to stop, a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. In appellant's brief to this court—a document the majority ignores—he cites *In re D.J.,* 532 A.2d 138 (D.C.1987), for the proposition that Officer Queen lacked a reasonable suspicion of criminal activity when he stopped appellant. In *In re D.J.,* we rejected the government's claim that the defendant's attempt to avoid police officers in a "high narcotics area," *id.* at 141, by putting his hands in his pockets and

---

3. Our dissenting Brother, while professing his fidelity to the Fourth Amendment, is simply

willing to hold reasonable that which we hold unreasonable.

walking away, created a reasonable suspicion of criminal activity.

Appellant argues that the facts here are indistinguishable from those in *In re D.J.* He claims, more specifically, that like D.J. he was merely exercising his legitimate right to avoid contact with the police. He stresses, moreover, that clutching something in his left hand was no more suspicious than D.J.'s putting his hands in his pockets. Finally, like D.J., appellant maintains that the fact that he was in an area known for drug trafficking did not make his otherwise innocent actions sinister.

I agree "that an attempt to evade the police, without more, is insufficient grounds to justify a *Terry* stop. Such conduct on the part of a suspect must be 'corroborated by other suspicious circumstances....'" *In re D.J.*, 532 A.2d at 142 (citation omitted). But, appellant's analogy to *In re D.J.* is otherwise misplaced. Aside from his evasiveness, appellant's actions, as well as his location, gave rise to a more particularized and reasonable suspicion of criminal activity than in *In re D.J.* I turn initially to the actions the police observed in each case.

In *In re D.J.*, the police had nothing more than a nebulous suspicion about D.J.'s involvement in criminal activity—exactly the sort of "inarticulate hunch[ ]" the Supreme Court has said does not justify a fourth amendment seizure. *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880. There was no evidence, for example, that the police feared D.J. might have been reaching for a weapon when he put his hands in his pockets and began walking away. Here, in contrast, the officer articulated his fear that appellant was holding a weapon. When asked what he thought when he saw appellant clutching something in his left hand, Officer Queen testified that "it could possibly have been a weapon, a small knife, possibly a gun." Officer Queen's fear that appellant was carrying a gun or a knife was not the sort of hunch found insuffi-

cient in *In re D.J.*; it was a "particularized suspicion" that justifies a *Terry* stop, *see generally United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), provided (1) carrying a gun or knife constitutes criminal activity and (2) Officer Queen's suspicion was reasonable under the circumstances.

## II.

I next address whether carrying a gun or a knife constitutes criminal activity in the District of Columbia and where my colleagues' analysis of this issue goes astray.

### A.

The majority concedes that carrying a gun without a license is criminal activity, proscribed by D.C.Code § 22–3204 (1989). *Ante* at 281. Indeed, there is no question under our caselaw that when a police officer has a reasonable basis for believing a suspect is carrying a gun, the officer has an articulable suspicion of criminal activity within the meaning of *Terry*. In several cases involving an informant's tip that a suspect was carrying a gun, we concluded the tip provided a reasonable basis upon which the police could form a suspicion that a person was armed, and, as a consequence, we upheld the officer's right to stop the suspect.[1]

The majority, however, disposes of Officer Queen's suspicion that appellant was concealing a gun in his hand by stating that "there was no objectively reasonable basis for concluding that Peay was so engaged." *Ante* at 281–82. Although they employ the language of objectivity, there is no hiding the fact that my colleagues in the majority have assumed the role of factfinder and, without the benefit of any evidence on the matter, have discredited Officer Queen's testimony on the ground that they personally "know of no pistol so small as to permit such concealment from a

---

1. *See, e.g., Lawson v. United States*, 360 A.2d 38 (D.C.1976) (investigatory stop reasonable after police received anonymous phone call about man at phone booth carrying pistol in his pocket, when suspect acted in manner consistent with possessing concealed weapon); *Gaskins v. United States*, 262 A.2d 810, 811 (D.C.1970) (police justified in stopping and searching three men after cab driver informed them he saw "a guy up the street tuck a gun inside his belt").

trained police officer standing three feet away in a well-lit hallway." *Ante* at 282. Although the reasonableness of Queen's suspicions may well have been fertile ground for cross-examination—especially because Officer Queen was only three feet away from appellant in a well-lit corridor—defense counsel did not pursue that avenue of inquiry at the suppression hearing. Not surprisingly, therefore, the trial court credited Queen's testimony.[2]

Unlike the majority, I believe that as an appellate court we must defer to the trial court's implicit determination that Queen subjectively believed appellant may have been clutching a gun. *See Giles v. United States*, 400 A.2d 1051, 1054 (D.C.1979); D.C.Code § 17–305(a) (1989). The only situation in which an appellate court may properly make a credibility determination is in the extremely rare case when testimony is "inherently incredible."[3] I do not believe it is "inherently incredible" that a clutched hand, even one with no metal visible from the angle of observation, could be holding a small gun. There is no record basis for believing—and the majority does not explain why—the barrel of a gun (or for that matter the blade of a knife) could not have been blocked from view by the forearm, for example.

### B.

Because Officer Queen suspected that appellant was clutching either a gun or a small knife, I believe a court can conclude that the officer had a sufficient basis for a seizure only if, under the circumstances, a knife gives rise to the same suspicion of criminal activity as a gun.

I would conclude as a matter of law that Officer Queen's suspicion that appellant was carrying a knife (if not a gun) was enough, under the circumstances, to justify the stop. As the majority states, *see ante* at 281, 282, under D.C.Code §§ 22–3204 and 22–3214 (1989), carrying a knife other than a switchblade[4] is not a crime, absent an intent to use it as a weapon against another. *See Nelson v. United States*, 280 A.2d 531, 533 (D.C.1971) (per curiam) (test for determining whether knife is "deadly or dangerous weapon"—and therefore illegal under § 22–3204—is whether, under circumstances, purpose of carrying knife is to

---

2. The court concluded:

   The activity of the defendant prior to the actual question which was lodged by the police officer, was such that when the police officer saw that the defendant had something in his hand, he could reasonably have a suspicion of there being a problem. Therefore, when he said, "Stop. What is in your hand?" ... he was only addressing what for him was an articulable suspicion of criminal activity and danger to himself.

3. As we stated in *In re A.H.B.*, 491 A.2d 490, 496 n. 8 (D.C.1985):

   The doctrine of inherent incredibility can be invoked only when the testimony can be "disprove[d] ... as a matter of logic by the uncontradicted facts or by scientific evidence," or when "the person whose testimony is under scrutiny made allegations which seem highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." *Jackson [v. United States]*, 122 U.S.App.D.C. [324,] 329, 353 F.2d [862,] 867 [ (1965) ] (footnotes omitted). This is a very stringent test which has been met in only a tiny number of cases, of which the

twenty-year-old *Jackson* case is one of the most recent.

4. Possession of a switchblade knife is a strict liability offense under D.C.Code § 22–3214(a). On this point, the majority concludes:

   [W]e hold that any belief Officer Queen may have had that Peay could conceal a switchblade in a clenched hand in a well-lit hallway when Queen was standing three feet away was unreasonable. Besides, Queen stated that he suspected the presence of a "small knife," which would for all practical purposes rule out a switchblade.

   *Ante* at 282. This statement demonstrates the danger of appellate court fact-finding because as a factual matter it is plainly wrong. A distinguishing characteristic of a switchblade knife is that it is compact and easily concealed when the blade is in the depressed position. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY defines switchblade as "a *pocketknife* having the blade spring-operated so that pressure on a release catch causes it to fly open." (Emphasis added.) There is no record basis for believing a switchblade knife could not be concealed by a clenched hand, no matter how well-lit the hallway or how well-trained the police officer. Nor is there any reason to conclude that the term "small knife" does not include the possibility of a switchblade.

use as weapon); *Scott v. United States*, 243 A.2d 54, 56 (D.C.1968) (same); D.C. Code § 22–3214(b) ("No person shall within the District of Columbia possess, *with intent to use unlawfully against another*, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, or other dangerous weapon.") (emphasis added).

The majority does not seriously question the possibility that appellant may have been clutching a small knife in his hand. See *ante* at 282. My colleagues focus instead on the issue of appellant's intent in carrying a knife. They stress that appellant was attempting to walk away from Officer Queen and then conclude: "Under such circumstances we hold as a matter of law that there was no reasonable basis for suspecting that Peay harbored an intent to use whatever knife may have been concealed within his clenched hand as a weapon unlawfully against another." *Ante* at 282. I disagree.

I believe a police officer is permitted to take into account the common relationship between drugs and violence when assessing someone's purpose in carrying a knife in the corridor of a building where illegal drugs are known to be sold. The court noted that Queen and his partners knew "of the dangers to their own safety inherent in drug trafficking and being in areas where drugs are being sold." Appellant stresses that "[i]nnocent activities do not become sinister by the mere fact that they take place in [areas which are denoted 'high narcotics areas' by police]." *In re D.J.*, 532 A.2d at 143. There is a big difference, however, between saying that one's presence in a "high narcotics area," without a great deal more, does not give rise to a reasonable suspicion of criminal activity, *see id.*, and saying that the police, in assessing a person's intentions in carrying a perceived knife, may not take into account

that person's presence in the corridor of a particular building known for the sale of drugs. The fact that appellant was walking away from Officer Queen arguably may have indicated no immediate intent to use a weapon against the officer, but, given the locale, I believe it was reasonable for Officer Queen to suspect appellant had an intention to use a weapon unlawfully and imminently against someone. When an officer in such a situation reasonably suspects that a person he or she is following is clutching a knife, I conclude the officer will have a reasonable basis for believing that the suspect intends to use the knife as a weapon.[5] In the circumstances of this case, therefore, I believe it makes no difference whether Officer Queen perceived the possibility of a knife or a gun; either one provided a sufficient basis under *Terry* for suspecting impending criminal activity.

### III.

The only question remaining is whether Officer Queen's suspicion, based on his own observations, that appellant was carrying a weapon was objectively reasonable under the circumstances. While I do not believe an appellate court can properly override the trial court's assessment of an officer's subjective belief—other than in the exceedingly rare case where that belief is "inherently incredible," see *supra* note 3—I do believe we are obliged to assess the objective reasonableness of that belief. *See Johnson v. United States*, 350 A.2d 738, 740–41 (D.C.1976). When addressing this issue, I believe it is also important to remember that the evidence supporting the stop "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

---

**5.** I find the majority's statements to the contrary rather remarkable. The majority opinion is clearly written from the vantage point of hindsight—secure in the knowledge that Officer Queen's suspicions about a weapon turned out to be unwarranted. I find it difficult to believe that if presented with a case where a police officer was certain that a suspect was clutching a knife while walking in the corridor of a known "crackhouse," the majority would find the officer had no reasonable basis for inferring unlawful intent—and therefore no basis for a *Terry* stop—merely because the suspect was walking away from the officer.

Given the circumstances, I believe Officer Queen's suspicion that appellant was carrying a weapon was objectively reasonable. First, Queen based his suspicion on his observation of appellant clutching something in his left hand. We know that Queen did not imagine or fabricate the fact that appellant was clutching something. Queen asked appellant what was in his hand, and soon thereafter appellant dropped what he was holding: several bags of cannabis. Second, the fact that appellant was in a building specifically known for drug trafficking added to the reasonableness of Officer Queen's suspicion. While "[t]housands of persons live and go about their legitimate business in areas which are denoted 'high narcotics areas' by police," *In re D.J.*, 532 A.2d at 143, I believe the risk of unjustified "locational taint" is substantially reduced, though not eliminated, when a suspect enters a particular building known for drug sales. In this case, Officer Queen testified that he and the other officers were in a building specifically known for the sale of marijuana and crack cocaine. He testified that every floor of the building appellant entered was routinely patrolled by police investigating drug activity. Recognizing the violence often associated with drug trafficking, Queen was not unreasonable in becoming more alert to the possible presence of illegal weapons and more apprehensive of his own safety and the safety of others upon entering this building than he would have been in other locales, even other general locales within a "high narcotics area." Finally, given the fact that Officer Queen's testimony on these matters was not inherently incredible, was unchallenged by the defense, and was unquestioned by the trial court evaluating his credibility, it is not our place as an appellate court to engage in speculation and substitute our judgment as to how likely it was that Queen actually mistook a fist full of plastic bags for a hand clutching a weapon.

6. *Cf. Crowder v. United States*, 379 A.2d 1183, 1185 (D.C.1977) (police officer who knew it was not unusual for persons carrying newspapers and shooting craps on streets in particular area to have weapons rolled in newspapers could

### IV.

In sum, I cannot say as a matter of law that the trial court erred in crediting Queen's testimony and concluding that Queen had a reasonable, articulable suspicion of criminal activity within the meaning of *Terry.* I therefore conclude that, under the totality of the circumstances, Queen's suspicion that appellant was carrying a weapon was reasonable and constituted a sufficient basis for an investigatory stop.[6] While I am concerned that the asserted fear of a concealed weapon could become an automatic ground invoked by police officers for making improper *Terry* stops, I believe the trial courts are alert to this danger and can evaluate critically the testimony offered, as well as the reasonableness of an officer's belief in light of the totality of the circumstances of each case.

Respectfully, therefore, I dissent.

fairly conclude, having come upon crap game, that appellant's nervous manner and attempt to shield newspaper from view indicated presence of weapon).